IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| SITE 2020 INCORPORATED,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>SUPERIOR TRAFFIC SERVICES,<br>LLC,<br><br>　　　　Defendant. | CV 21-63-M-DLC-KLD<br><br><br>FINDINGS &<br>RECOMMENDATION |
| SUPERIOR TRAFFIC SERVICES,<br>LLC and SUPERIOR TRAFFIC<br>SYSTEMS, LLC,<br><br>　　　　Counterclaim-Plaintiffs,<br><br>vs.<br><br>SITE 2020 INCORPORATED,<br><br>　　　　Counterclaim-Defendant. | |

This patent infringement case comes before the Court on Defendant and Counterclaim-Plaintiff Superior Traffic Services, LLC and Counterclaim-Plaintiff Superior Traffic Systems, LLC's (collectively "Superior Traffic") motion for leave to file Third Amended Counterclaims (Doc. 78) and motion for sanctions based on alleged litigation misconduct by Plaintiff and Counterclaim-Defendant Site 2020 Incorporated ("Site 2020"). (Doc. 98). Having considered the arguments and

evidence presented, the Court recommends that Superior Traffic's motion for leave to file its proposed Third Amended Counterclaims and motion for sanctions be granted in part as set forth below.

## I.   **Procedural Background**

Site 2020 and Superior Traffic are competitors in the portable traffic signal industry. Site 2020 initiated this patent infringement action against Superior Traffic in May 2021, alleging that Superior Traffic's portable traffic management systems infringe on multiple claims of two Site 2020 patents. (Docs. 1 and 29). Superior Traffic has asserted several counterclaims, including a patent infringement counterclaim accusing Site 2020's Guardian Portable Traffic Light ("Guardian PTL") of infringing Superior Traffic's U.S. Patent No. 9,135,817, titled "Traffic Management System" (the '817 Patent"). (Docs. 15, 30, and 47 at 71 ¶ 137).

Site 2020 moved to dismiss Superior Traffic's patent infringement counterclaim pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for relief. (Doc. 48). On April 1, 2022, the undersigned issued Findings and Recommendation, recommending that Site 2020's motion to dismiss be denied.[1] (Doc. 72). Two weeks later, Superior Traffic moved for leave file Third Amended Counterclaims, claiming it had only recently learned that Site 2020's

---

[1] Site 2020 did not file objections to the Findings and Recommendation, which is awaiting review by presiding United States District Court Judge Dana L. Christensen.

Guardian PTL was never commercialized and seeking leave to amend its infringement counterclaim to instead identify Site 2020's flagship traffic management system – the Guardian SmartFlagger AFAD – as the accused product. (Doc. 78). At the time Superior Traffic filed its motion to amend its counterclaims in mid-April, the parties had completed *Markman* briefing and a *Markman* hearing was scheduled for May 17, 2022. (Doc. 71). In light of the issues raised by the parties in connection with Superior Traffic's motion to amend its counterclaims, however, the Court vacated the *Markman* hearing and held a status conference on May 17, 2022 instead. (Docs. 85 and 88).

During the status conference, Superior Traffic raised allegations of litigation misconduct that form the basis of the pending motion for case terminating sanctions against Site 2020. Given the seriousness of Superior Traffic's allegations, the Court vacated the pretrial scheduling order, permitted limited discovery on the matters raised by Superior Traffic, and established briefing deadlines for Superior Traffic's anticipated motion for sanctions. (Doc. 89). The Court held a hearing on the motion on December 13, 2022, and makes the following factual findings based on the evidence of record.

## II.   **Motion for Sanctions**

### A.   **Factual Findings[2]**

---

[2] Citations to the evidentiary record will consist of (1) the exhibit number

Site 2020 is a corporation with its principal place of business in Nova Scotia, Canada. (Doc. 29 at ¶ 11).  At all times relevant to this motion, Mitchell Hollohan was Site 2020's Chief Executive Officer (Ex. 25 Doc. 101-20 at 14 [48:15-19]), Trevor Romkey was its Chief Operations Officer (Ex. 24 Doc. 101-19 at 5-6 [13:18-14:13]), and Chris Edelman was its Vice President of Sales and Operations (Ex. 24 Doc. 101-19 at 6 [16:6-12]; Ex. 25 Doc. 101-20 at 60 [232:22-233:7]).

The two Superior Traffic entities are limited liability companies with a principal place of business in Missoula, Montana. (Ex. 32 Doc. 99-33 at ¶ 1). Jeff Hollenback is Superior Traffic's President and Chief Executive Officer. (Ex. 32 Doc. 99-33 at ¶ 1).

Site 2020 and Superior Traffic compete in providing portable traffic signals, including Automated Flagger Assistance Devices ("AFADs") to road construction and maintenance companies, among others. (Ex. 25 Doc. 101-20 at 8 [23:3-9], 25 [92:2-6], 76-77 [297:24-298:5]; Ex 24 Doc. 101-19 at 9 [28:4-13]; Ex 18 Doc. 101-15 at 55 [209:13-20]). In February 2021, Superior Traffic made a business pitch to Southwest Safety, a New Mexico-based company that operates in the road construction and maintenance business, about the possibility of doing business

---

referenced by the parties in the briefing; (2) the corresponding unredacted document number generated by the Court's Case Management/Electronic Case Filing system; and (3) pinpoint cites to the CM/ECF page number and/or document paragraph/line numbers.

together. (Ex. 18 Doc. 101-15 at 13-14 [44:22-46:24]; Ex. 29 Doc. 101-21 at 11 [34:21-35:23]). The meeting, which took place at Southwest Safety's facility in Albuquerque and was attended by Mike Biggers, then a Superior Traffic regional sales representative, and George Thompson, Southwest Safety's Sales Manager and Estimator, did not lead to a business relationship. (Ex. 18 Doc. 101-15 at 19 [67:17-68:6]; 22 [77:15-78:11], 24 [85:23-86:2]; Ex 29 Doc. 101-21 at 11 [36:2-7]).

In May 2021, the same month that Site 2020 filed this lawsuit, persons or entities controlling Site 2020 acquired a controlling interest in Southwest Safety. (Ex 25 Doc. 101-20 at 54-55 [209:15-212:17]; Ex 6 Doc. 101-4 at 5 [11:20-13:2]; Ex. 26 Doc. 99-27). Site 2020's Chief Operations Officer, Romkey, assumed operational control of Southwest Safety. (Ex. 1 Doc. 101-1 at 9 [29:1-15]).

In August 2021, Site 2020 posted a testimonial video by Southwest Safety for Site 2020's Guardian SmartFlagger AFAD. (Ex. 27 Doc. 99-28; Ex 25 Doc. 101-20 at 50 [192:16-196:20]; Ex. 28 Doc. 99-29). The video featured Hollohan and Southwest Safety's president at the time, Jeff Garrett, but did not reveal Southwest Safety's affiliation with Site 2020. (Ex. 1 Doc. 101-1 at 9 [26:18-27:10]; Ex. 25 Doc. 101-20 at 50 [193:16-18]; Ex. 18 Doc. 101-15 at 61 [234:23-237:4]; Ex. 28 Doc. 99-29 (digital format). After learning of the video, Superior Traffic contacted Garrett to see if Southwest Safety would be willing to entertain

another business pitch from Superior Traffic. (Ex 18 Doc. 101-15 at 27 [100:16-101:16], 61 [234:23-237:4]). When Superior Traffic initiated this contact, it was not aware that Site 2020 and Southwest Safety were affiliated. (Ex. 18 Doc. 101-15 at 35 [131:17-20]).

Romkey, who by this time was managing operations at Southwest Safety, conveyed Superior Traffic's overture to his colleagues in Site 2020's leadership, including Hollohan. (Ex. 1 Doc. 101-1 at 7 [20:23-21:8], 9 [29:9-15], 10 [31:10-32:2]; Ex 25 Doc. 101-20 at 57 [219:19-24])). Romkey instructed Thompson to accept Superior Traffic's offer to provide another product demonstration, to take place at Southwest Safety's facility in Albuquerque. (Ex. 1 Doc. 101-1 at 10 [32:15-33:15], 12 [40:2-41:1]; 13 [42:14-43:22]). Thompson and Biggers scheduled the meeting for December 8, 2021. (Ex. 1 Doc. 101-1 at 12 [40:2-4], 30 [110:20-111:21; 112:1-113:6]; Ex. 4 Doc. 99-5; Ex. 5 Doc. 99-6).

As an additional inducement to meet, Thompson told Biggers that Southwest Safety was no longer under contract with Site 2020. (Ex. 29 Doc. 101-21 at 20 [69:20-70:2], 21 [74:22-75:12]). Thompson also told Biggers that Southwest Safety's owner would be present at the meeting, so Biggers asked Superior Traffic's President and Chief Executive Officer, Jeff Hollenback, to attend. (Ex. 18 Doc. 101-15 at 5 [11:15-12:17]; Ex. 29 Doc. 101-21 at 28 [102:25-103:17]). Southwest Safety did not tell Biggers that Garrett had sold the company or that it

was now affiliated with Site 2020. (Ex. 29 Doc. 101-21 at 28 [103:14-17]).

Prior to the meeting, Romkey suggested that Site 2020's field operations manager, Quinn Graham, attend the meeting. (Ex. 6 Doc. 101-4 at 7 [18:21-21:8]). In the days leading up to the meeting, Romkey, Graham, and Hollohan planned to have Graham attend the meeting posing as a Southwest Safety employee. (Ex 6 Doc. 101-4 at 7 [18:21-21:8], 9 [27:14-29:20], 18 [63:8-64:8, 64:24-65:16]; Ex. 9 Doc. 101-6; Ex. 10 Doc. 101-7). At his deposition on May 31, 2022, Graham testified that he discussed his plans to attend the meeting with Romkey, Hollohan, and Edelman. (Ex. 6 Doc. 101-4 at 7 [18-21-21:8]. Graham further testified that prior to the meeting, he and Romkey specifically discussed the fact that Graham was not going to use his real name during the meeting. (Ex. 6 Doc. 101-4 at 9 [27:14-29:20]).

Graham also testified about two email conversations, the first of which started with a November 29, 2021, email in which Graham asked Thompson to select a day and time for the meeting the following week. Graham and advised Thompson "It's important you don't cc me in the emails or mention who I am. I'll come up with a fake name next week." (Ex. 6 Doc. 101-4 at 18 [63:10-15]; Ex. 9 Doc. 101-6 at 4-5). Thompson responded that he had requested the meeting, and on December 1, 2021, he emailed Graham stating that the product demonstration was "setup for Wednesday at 0900. Last time he wanted to do the demo inside and

walked through the warehouse. Are we going to do something with the Site 2020 equipment?"[3] (Ex. 9 Doc. 101-6 at 2-3). Graham forwarded the email to Hollohan, asking "What do you think? Leave the equipment? Move it?" (Ex 9 Doc. 101-6 at 2). Copying Romkey, Hollohan responded: "Tell him he can't come into the warehouse. COVID." (Ex. 9 Doc. 101-6 at 2).

In another email chain about scheduling the meeting, Graham emailed Romkey on December 2, 2021 saying "Getting there." Romkey responded on December 7, 2021, the day before the meeting, asking "All set up? You got a game plan?" (Ex. 10 Doc. 101-7 at 2).  This email was copied to Hollohan, who responded the next day, copying Graham: "Quinn can you download gmail on your phone? I think you get lost in your emails and they sit……….." (Ex. 10 Doc. 101-7 at 2).

At Graham's request, Site 2020's IT department created an email address for a fictitious person, Michael (Mike) Evans, at mevans@swsafetyservices.com, and gave Graham control of it. (Ex. 6 Doc. 101-4 at 11 [37:1-39:11], 12 [41:24-42:12]). Site 2020 also made a fake email signature for Graham posing as Mike Evans, which contained Southwest Safety's logo, address, and business phone number, as well as Graham's personal cell phone number. (Ex. 6 Doc. 101-4 at 11

---

[3] At the time, a number of Site 2020 Guardian SmartFlagger AFADs were being held in Southwest Safety's warehouse.

[36:14-37:9], 12-13 [41:7-43:2]; Ex. 7 Doc. 99-8). Romkey, Hollohan, and Edelman also provided Graham with questions to ask Superior Traffic during the meeting. (Ex. 6 Doc. 101-4 at 11 [35:2-16], 18-19 [65:17-66:23]).

   Shortly before Hollenback and Biggers arrived for the meeting on December 8, 2021, Graham installed a GoPro audiovisual recording device in the Southwest Safety warehouse where the product demonstration would take place. (Ex. 6 Doc. 101-4 at 18 [63:8-64:23], 34 [126:4-128:13]; Ex. 14 Doc. 101-11 at 00:00-00:17). Graham wore a Southwest Safety jacket during the demonstration, which lasted more than an hour and was recorded by the GoPro. (Ex. 1 Doc. 101-1 at 18 [64 :10-65:18], 19 [67 :13-19, 69 :8-11], 20 [71:9-15]; Ex. 6 Doc. 101-4 at 9 [29:21-30 :1], 26 [96:2-20], 35 [132 :7-10];  Ex. 14 Doc. 101-11; Ex. 15 Doc. 101-12; Ex. 16 Doc. 101-13; Ex. 17 Doc. 101-14). As Graham had instructed, Thompson introduced him to Hollenback and Biggers as Southwest Safety's general manager, Mike Evans. (Ex. 6 Doc. 101-4 at 8 [22:7-25], 34-35 [129:11-131:5]; Ex. 29 Doc. 101-21 at 6 [16:16-25], 27-28 [97:9-102:15], 31 [113:12-21], 33-34 [124:22-125:13]; Ex. 14 Doc. 101-11, at 10:26-10-:37).

   As directed by Hollohan, Romkey, and Edleman, Graham asked Hollenback and Biggers about several aspects of the technology used in Superior Traffic's AFAD units. Hollenback and Biggers provided extensive narrative answers on topics including: (1) automatic and manual mode operation (Ex. 6 Doc. 101-4 at 36

[137:1-3], 37 [138:8-10]; Ex. 18 Doc. 101-15 at 62 [240:14-24]; Ex. 15 Doc.101-12 at 00:00-5:50); (2) unit communication functionality (Ex. 6 Doc. 101-4 at 37 [140:8-16, 141:11-24]; Ex. 18 Doc. 101-15 at 62 [240:6-13]; Ex. 16 Doc. 101-13 at 06:11-07:02); (3) video feed communication functionality (Ex. 6. Doc. 101-4 at 19-21 [69:11-77:4]; Ex. 11 Doc. 101-8 at 5; Ex. 14 Doc. 101-11 at 14:06-14:20); Ex. 16 Doc. 101-13 at 0:00-0:33); (4) unit control (Ex. 11 Doc. 101-8 at 4-5; Ex. 15 Doc. 101-12 at 09:35-11:05; 11:46-13:20; 14:27-17:13); (5) network operations center control and functionality (Ex. 11 Doc. 101-8 at 4; Ex. 14 Doc. 101-11 at 16:30-16:40; Ex. 17 Doc.101-14 at 9:22-10:20); (6) how the units are towed in tandem (Ex. 11 Doc. 101-8 at 4; Ex. 14 Doc. 101-11 at 12:32-12:53; Ex. 17 Doc. 101-14 at 3:01-04:44); (7) who manufactures the units (Ex. 6 Doc. 101-4 at 20 [71:14-17]; Ex. 18 Doc. 101-15 at 62 [239:25-240:5]; Ex. 11 Doc. 101-8 at 4; Ex. 16 Doc. 101-13 at 8:50-09:12, 09:44-10:03); (8) solar power to the units (Ex. 17 Doc. 101-14 at 12:34-12:45); and (9) TESS mobile app functionality (Ex. 29 Doc. 101-21 at 32 [119:24-120:19]; Ex. 15 Doc. 101-12 at 0:59-1:25, 11:45-12:30, 14:27-17:13).

The meeting then moved to a conference room, where Hollenback and Biggers provided Graham and Thompson with a proposal regarding a prospective partnership between Superior Traffic and Southwest Safety. (Ex. 18 Doc. 101-15 at 60 [229:15-230:20]). This portion of the meeting lasted more than an hour, during

which time Graham questioned Hollenback and Biggers about a variety of business matters. (Ex. 18 Doc. 101-15 at 60 [229:15-230:20]; Ex. 29 Doc. 101-21 at 28-29 [103:18-105:24]) Hollenback and Biggers provided narrative answers divulging business information regarding: (1) how Superior Traffic makes its software available (Ex. 6 Doc. 101-4 at 20 [69:11-71:10]); (2) a new business relationship model for Superior Traffic's partners (Ex. 18 Doc. 101-15 at 29-31 [106:11-112:16, 114:23-115:8, 116:5-12]); and (3) Superior Traffic's efforts with regard to regulation (Ex. 18 Doc. 101-15 at 58 [221:4-224:1]; Ex 14 Doc. 101-11 at 13:11-13:53; Ex. 16 Doc. 101-13 at 14:07-15:04). Superior Traffic had only disclosed this information to two other potential business partners and would not have divulged it during the meeting had it not viewed Southwest Safety as a trustworthy potential business partner. (Ex. 18 Doc. 101-15 at 31-32 [115:9-118:4], 57 [217:24-220:8], 68 [264:1-8]; Ex. 32 Doc. 99-33 ¶ 9).

Graham also elicited information regarding the cost of Superior Traffic's units, where they are made, and how Superior Traffic's contracts work. (Ex. 29 Doc. 101-21 at 23 [83:14-84:4], 27-29 [97:9-105:24], 33 [122:7-25], 40 [151:3-152:18]; Ex. 6 Doc. 101-4 at 13 [44:6-45:9], 20 [71:7-73:19], 25 [90:12-91:14]; Ex. 22 Doc. 101-17). As the meeting was ending, Superior Traffic agreed to leave the two AFAD units it brought to the demonstration with Southwest Safety so that

it could test the units at a jobsite in New Mexico.[4] (Ex. 1 Doc. 101-1 at 16-17 [57:19-58:13]; Ex. 6 Doc.101-4 at 10 [30:2-25]; Ex. 18 Doc. 101-15 at 35 [129:12-130:4]; Ex. 29 Doc. 101-21 at 34 [127:1-128:2]).

At no time during the course of the meeting did Site 2020 or Southwest Safety inform Superior Traffic that the two entities were affiliated with one another (Ex. 1 Doc. 101-1 at 31 [115:16-116:17]; Ex. 29 Doc. 101-21 at 28 [103:14-17]); that Mike Evans was actually Site 2020's operations manager, Quinn Graham (Ex. 6 Doc. 101-4 at 8 [23:11-24:2]); or that they had recorded the product demonstration. (Ex. 6 Doc. 101-4 at 34 [128:14-17]). In the days that followed, Graham conveyed what he had learned during the meeting with Superior Traffic to Hollohan, Romkey, and Edelman. (Ex. 6 Doc. 101-4 at 10 [31:15-32:8, 32:23-33:9], 11 [34:2-21], 19-20 [69:11-72:16], 28-29 [105:13-107:16]; Ex. 11 Doc.101-8 at 4-7). Graham provided Hollohan, Romkey, and Edelman with the audiovisual recording of the meeting, as well as several photographs he took of Superior Traffic's AFAD units during the demonstration. (Ex. 6 Doc.101-4 at 10 [32:9-22], 19-20 [69:11-70:4], 28 [102:11-103:20], 32-34 [121:23-126:3]; Ex. 11 Doc. 101-8 at 4; Ex. 13 Doc. 101-10). Superior Traffic was not aware that Graham had

---

[4] Biggers resigned from Superior Traffic the day after the meeting, for reasons that are unrelated to this litigation and Superior Traffic's motion for sanctions. (Ex. 21 Doc. 99-22).

communicated this information to Site 2020's leadership. (Ex. 32 Doc. 99-33 at ¶5).

On January 6, 2022, Hollenback and Superior Traffic's Vice President of Sales and Operations, Mike Davis, received a call from an individual who identified himself as Isaac Cutrer, a former Southwest Safety employee. (Ex. 18 Doc. 101-15 at 35-36 [131:17-133:7], 37 [137:23-138:14]). Cutrer advised Hollenback and Davis that the individual posing as Southwest Safety employee Mike Evans during the meeting on December 8, 2021, was actually Site 2020 employee Quinn Graham. (Ex. 18 Doc. 101-15 at 35-36 [131:17-133:7], 37 [137:23-138:14]). According to Hollenback, Cutrer described it as "some real covert shit." (Ex. 18 Doc. 101-15 at 35 [132:7-8]). Cutrer had gotten his information from Robert Sanchez, who had volunteered it to Cutrer as "covert spy shit" in December 2021. (Ex. 20 Doc. 99-21 at 5-9). Superior Traffic never communicated with Sanchez, and did not know anything about him or his involvement until Cutrer forwarded Sanchez's texts to Superior Traffic on January 6, 2022. (Ex. 18 Doc. 101-15 at 38 [142:18-143:7], 62 [237:12-19]; Ex. 20 Doc. 99-21; Ex. 32 Doc. 99-33 at ¶ 4).

Superior Traffic asked Cutrer if he would be willing to take photographs of the AFAD units. (Ex. 18 Doc. 101-15 at 38 [142:18-143:7], 38-40 [144:23-145:13, 149:3-25]; Ex. 20 Doc. 99-21) Cutrer agreed, and texted the photographs to

13

Superior Traffic later that day. (Ex. 18 Doc. 101-15 at 41 [156:5-9]; Ex. 20 Doc. 99-21). Based on Cutrer's description of where the AFADs were located, Superior Traffic assumed Cutrer would be able to take the requested photographs from off Southwest Safety's property. Superior Traffic did not ask Cuter to enter Southwest Safety's premises to obtain the photographs. (Ex. 18 Doc. 101-15 at 41 [155:9-16, 156:10-13], 42 [157:12-15, 158:4-23]).

As reflected in the photographs, someone had disassembled the Superior Traffic AFAD units' control devices after the product demonstration. (Ex. 6 Doc. 101-4 at 30 [113:12-14]; Ex. 18 Doc. 101-15 at 42 [159:13-18]; Ex. 20 Doc. 99-21). Superior Traffic arranged for a contract hauler to retrieve its AFAD units the next day. (Ex. 18 Doc. 101-15, at 36 [133:23-134:9, 135:11-136:15]). Acting on instructions from Romkey and Edelman, and still posing as Mike Evans, Graham emailed Davis several times in mid-January 2022 asking Superior Traffic to return the units. (Ex. 6 Doc. 101-4 at 11 [36:14-37:9], 13-14 [43:3-46:5], 14 [49:12-16], 22 [81:10-82:11]; Ex. 7 Doc. 99-8; Ex. 12 Doc. 101-9). Romkey instructed Graham to tell Superior Traffic that if it would return the AFAD units, Southwest Safety would commit to entering into a contract with Superior Traffic. (Ex. 6 Doc. 101-4 at 14 [48:16-49:2]). In his emails, Graham continued to portray Southwest Safety as arm's length from Site 2020, telling Davis, "As far as Site 2020 – we are having some customer support issues .. [sic] which is one thing I really like about

STS." (Ex. 7 Doc. 99-8 at 2).

Hollenback has made clear that Superior Traffic would not have agreed to the December 8, 2021, meeting had it known it was presenting to an employee of its litigation opponent, Site 2020. (Ex. 18 Doc. 101-15 at 59 [227:22-228:7]).

## B.   Legal Standard

Because the decision to sanction a litigant "is one that is not unique to patent law," regional circuit law provides the controlling legal standard. *United Construction Products. Inc. v. Tile Tech, Inc.*, 843 F.3d 1363, 1367-68 (Fed. Cir. 2016). District courts have the power to impose sanctions for litigation misconduct under the both the Federal Rules of Civil Procedure and the court's inherent authority. *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006). "Regardless of the source of authority relied upon, the district court has broad discretion to fashion appropriate sanctions." *Webster v. Psychiatric Medical Care, LLC*, 386 F.Supp.3d 1358, 1362 (D. Mont. 2019) (citing *Leon*, 464 F.3d at 958). See also *Pruco Life Ins. Co v. California Energy Development Inc.*, 2022 WL 1037111 at *10 (S.D. Cal. Apr. 6, 2022) (explaining that a district court "has broad fact-finding powers with respect to sanctions, and its findings warrant great deference"). This "deference extends to the [c]ourt's credibility determinations." *Pruco Life Ins.*, 2022 WL 1037111, at *10 (citing *Hernandez v. City of El Monte*, 138 F.3d 393, 398 (9th Cir. 1998)).

Superior Traffic requests sanctions under the Court's inherent authority. District courts have the inherent power to impose sanctions for a "full range of litigation abuses." *Evon v. L. Offices of Sidney Mickell*, 688 F.3d 1015, 1035 (9th Cir. 2012). See also *Fink v. Gomez*, 239 F.3d 989, 992 (9th Cir. 2001) (Courts have "the inherent authority to impose sanctions for bad faith, which includes a broad range of willful improper conduct.").

When acting under its inherent authority, "a district court must find either: (1) a willful violation of a court order; or (2) bad faith." *America Unites for Kids v. Rousseau*, 985 F.3d 1075, 1090 (9th Cir. 2021). "A determination that a party was willfully disobedient is different from a finding that a party acted in bad faith. Either supports the imposition of sanctions." *America Unites*, 985 F.3d at 1090 (quoting *Evon*, 688 F.3d at 1035). "[A] 'willful' violation of a court order does not require proof of mental intent such as bad faith or an improper motive, but rather, it is enough that a party acted deliberately." *America Unites*, 985 F.3d at 1090 (citing *Evon*, 688 F.3d at 1035). Bad faith, on the other hand, "includes conduct done vexatiously, wantonly, or for oppressive reasons, requires proof of bad intent or improper purpose." *America Unites*, 985 F.3d at 1090.  Bad faith may "be found in the conduct of the litigation." *America Unites,* 985 F.3d at 1090.

"[B]ecause a district court's inherent powers are so potent," the Ninth Circuit requires "that when a court imposes sanctions based on bad faith, the court must make an explicit finding that the sanctioned party's conduct 'constituted or was tantamount to bad faith'." *America Unites*, 985 F.3d at 1090 (citing *Primus Auto Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 648-50 (9th Cir. 1997)).  See also *Leon*, 464 F.3d at 961; *Lahiri v. Universal Music and Video Distribution Corp.*, 606 F.3d 1216, 1219 (9th Cir. 2010). The party requesting sanctions bears the burden of establishing that sanctions are warranted. See *Ryan v. Editions Ltd. W., Inc.*, 786 F.3d 754, 766 (9th Cir. 2015); *Wooten v. BNSF Railway Co.*, 2018 WL 2417858, at *8 (D. Mont. May 29, 2018).

Courts have the inherent authority to impose case terminating sanctions when "a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings" or "has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice." *Leon*, 464 F.3d at 958. Case terminating sanctions may also be appropriate if the litigation misconduct "relates to the matters in controversy in such a way as to interfere with the rightful decision of the case." *Renner v. Takeda Pharmaceuticals U.S.A. Inc.*, 2017 WL 120852 at *2 (D. Mont. Jan. 12, 2017) (quoting *United States v. Natl. Med. Enterprises, Inc.*, 792 F.2d 906, 912 (9th Cir. 1986)).

Before imposing case terminating sanctions, courts should consider five

factors: "(1) the public's interest in expeditious resolution of litigation; (2) the

court's need to manage its dockets; (3) the risk of prejudice to the party seeking

sanctions; (4) the public policy favoring disposition of cases on their merits; and

(5) the availability of less drastic sanctions." *Leon*, 464 F.3d at 958. While the

court need not make explicit findings for each factor, it cannot impose dismissal or

other terminating sanctions without a finding of "willfulness, fault, or bad faith."

*Leon*, 464 F.3d at 958 (quoting *Anheuser-Busch, Inc. v. Natural Beverage*

*Distributors*, 69 F.3d 337, 348 (9th Cir. 1995)).

### C.    Discussion

Superior Traffic argues Site 2020 has engaged in litigation misconduct that

goes to the heart of the case, implicates several critical interests, and warrants

severe, case terminating sanctions. Specifically, Superior Traffic asks the Court to

dismiss Site 2020's patent infringement claims with prejudice and enter default

judgment against Site 2020 on all 17 of Superior Traffic's counterclaims.  (Doc. 98

at 2).

Superior Traffic maintains that such severe sanctions are warranted because

Site 2020's litigation misconduct is inextricably intertwined with the merits of the

claims and counterclaims that are at issue in the case. Site 2020's pleadings allege

that Superior Traffic's AFAD product infringes on two Site 2020 patents

18

protecting the AFAD products it has developed.  (Doc. 1 at ¶¶ 40-50; Doc. 29 at ¶¶ 46-67). Superior Traffic has asserted several counterclaims, including claims for infringement of its '817 Patent; false advertising, unfair competition, and related torts; and antitrust and related anticompetition counterclaims.[5] (Doc. 47 at ¶¶ 65-146).

The AFAD unit that Superior Traffic demonstrated at the December 8, 2021 meeting is the same product that Site 2020 accuses of infringing its patents. Hollenback – who co-developed the accused AFAD's technology and is a named inventor on the '817 Patent (Ex. 32 Doc. 99-33 at ¶ 2) – and Biggers were questioned at length by Graham during the meeting and provided narrative answers about several matters that are relevant to Site 2020's patent infringement claims and the technology involved. As detailed above, the matters discussed included, among others, automatic and manual mode operation; unit communications functionality; video functionality; network operations functionality; and solar power to the AFAD units. That these topics are relevant to Site 2020's patent infringement claims is evident from its preliminary infringement contentions for

[5] As previously mentioned, Superior Traffic has moved for leave to amend its counterclaims to identify Site 2020's accused product as the Guardian SmartFlagger instead of the Guardian PTL. Superior Traffic's proposed amended counterclaims would also provide additional factual allegations in support of its counterclaims for false advertising, unfair competition, and related torts. (Doc. 78). Superior Traffic's motion to amend is discussed below.

U.S. Patent No. 10,249,186, which contain allegations relating to the accused

AFAD's automatic and manual mode operation (Ex. 30 Doc. 99-31 at 10, 22-24;

31); cellular, wifi, and MHz communications (Ex. 30 Doc. 99-31 at 8, 21-22, 25,

35); video functionality (Ex. 30 Doc. 99-31, 12); network operations center

functionality (Ex. 30 Doc. 99-31 at 17); and use of solar power (Ex. 30 Doc. 99-31

at 20).[6]

Site 2020 also obtained information on matters relevant to some of Superior

Traffic's counterclaims, including particularly those based on Site 2020's alleged

false and misleading advertising. For example, Superior Traffic claims Site 2020

distributed a Competitor Audit flyer that falsely or misleadingly described several

aspects of Superior Traffic's AFAD units, including how they are towed, their

flexibility to work in different types of work modes, their use of solar power, and

their long-range connectivity and video functionality. (Doc. 47 at 47 ¶¶ 22-31). As

described above, Hollenback and Biggers touched on each of these topics during

the December 8, 2021, product demonstration.

Superior Traffic contends Site 2020 thus obtained an array of information

relevant to the merits of this litigation through its willfully deceptive conduct. In

---

[6] Site 2020's preliminary infringement contentions for U.S. Patent No. 11,055,993
similarly include allegations that are relevant to many of the same topics. (See Ex.
31 Doc. 99-32).

doing so, Superior Traffic submits, Site 2020 effectively circumvented the Federal Rules of Civil Procedures governing discovery and deprived Superior Traffic of the procedural protections to which it was entitled. Superior Traffic maintains that Site 2020 also interfered with its statutory right to litigate through counsel[7], and essentially obtained a lengthy, undisclosed, ex parte recorded interview with the president of its party-opponent on matters relating to the merits of the claims and counterclaims asserted in the case.

In light of Site 2020's willfully deceptive conduct, Superior Traffic argues, neither it nor the Court can have any confidence that Site 2020 will conduct itself honestly as this litigation proceeds. Superior Traffic contends that as a result, it has been substantially prejudiced by Site 2020's litigation misconduct and the case terminating sanctions it requests are appropriate.

Site 2020 does not seem to dispute that it obtained information that is generally relevant to the merits of several claims in this case during the product demonstration, but argues no sanctions are warranted for two threshold reasons. First, Site 2020 takes issue with the timing of the motion, and argues Superior Traffic unduly delayed in requesting sanctions after learning of Site 2020's alleged misconduct. (Doc. 108 at 8-9; 14-16; 27-30). Superior Traffic was advised by

---

[7] See 28 U.S.C. ¶ 1654 ("In all courts of the United States the parties may plead and conduct their own cases … by counsel as, by the rules of such courts … are permitted to manage and conduct causes therein.")

Cutrer on January 6, 2022, that the individual who had identified himself as

Southwest Safety employee Mike Evans during the product demonstration was

actually Site 2020 employee Quinn Graham. (Ex. 18 Doc.101-15 at 35-36 [131:17-

133:7], 37 [137:23-138:14]). Site 2020 faults Superior Traffic for waiting until the

hearing on May 17, 2022, to raise the issue of sanctionable conduct with the Court.

As Site 2020 describes it, Superior Traffic "and its counsel willfully continued all

aspects of the present litigation – including participation in routine discovery,

motion practice, document production, witness depositions, and claim construction

proceedings - for more than 130 days before informing the Court or Site 2020's

counsel of its now-stated belief that Site 2020 had committed litigation misconduct

that should result in case-terminating sanctions." (Doc. 108 at 14). Site 2020 points

out that Superior Traffic's proposed third amended counterclaims, which were

attached as an exhibit to its pending motion for leave to amend on April 14, 2022

(Doc. 80-1), already included allegations relating to Site 2020's conduct at the

product demonstration. Superior Traffic did not raise the issue as a basis for

sanctions at that time, however, and Site 2020 claims Superior Traffic is now

attempting to reform its prior tort allegations into a demand for case terminating

sanctions. At bottom, Site 2020 argues the fact that Superior Traffic waited nearly

four and a half months to raise the issue as a basis for sanctions undercuts its

allegations as to the seriousness of the misconduct and its request for case terminating sanctions.

The Court does not find this argument persuasive. The record reflects that Superior Traffic served deposition notices for Romkey and Hollohan on January 11, 2022, just five days after it was contacted by Cutrer. (Ex. A Doc. 111-1). Site 2020's attorneys were not available for depositions until early March 2022. (Ex. B Doc. 111-2).  When Superior Traffic deposed Romkey and Hollohan in March 2022, they denied knowing whether Graham identified himself to Superior Traffic as a representative of Site 2020 during the product demonstration. (Ex. 24 Doc. 101-19 at 51 [195:23-196:8]; Ex. 25 Doc. 101-20 at 58 [222:23-223:1]). Superior Traffic then issued a subpoena for document production to Southwest Safety, and on May 6, 2022, Southwest Safety produced the email in which Graham told Thompson he would "come up with a fake name next week." (Ex. 9 Doc. 101-6 at 5; Ex. 32 Doc. 99-33 at ¶ 3).

Hollenback explains that "[a]lthough Isaac Cutrer's communications alerted Superior to the fact that Site 2020 had done something fraudulent, I did not know for sure until receiving documents subpoenaed from Southwest Safety on or about May 6, 2022, that the 'Michael Evans' we had met at the December 8, 2021, meeting at Southwest Safety was, in fact, Quinn Graham of Site 2020." (Ex. 32 Doc. 99-3 at ¶ 3). Superior Traffic timely raised the issue with the Court and Site

2020's counsel less than two weeks later, at the hearing on May 17, 2022. The

record further reflects that Superior Traffic did not know until Graham's deposition

several days after the hearing that Site 2020's senior leadership were personally

involved in the fraud. (Ex. 18 Doc.101-15 at 66-67 [256:24-258:6]; Ex. 32 Doc.

99-33 at 3 ¶ 5).

While Superior Traffic included some general factual allegations relating to

Site 2020's conduct in the proposed Third Amended Counterclaims it submitted in

April 2022 (Doc. 80-1 at 52 ¶ 112), it did not have sufficient evidence that Mike

Evans was actually Graham until early May 2022. Thus, to the extent Site 2020

argues Superior Traffic's motion for sanctions should be denied as untimely, the

Court concludes otherwise.

Second, Site 2020 maintains that sanctions are not appropriate because

Superior Traffic has engaged in misconduct of its own. (Doc. 108 at 16-18, 31-33).

For instance, Site 2020 claims that when Superior Traffic asked Cutrer to take

photographs of its AFAD units, it encouraged Cutrer to trespass inside Southwest

Safety's warehouse. On the day of Cutrer's call, Davis texted Cutrer asking if he

"would be willing to drive by and see if you can get a visual on the AFADs" if

Cutrer was comfortable he could "do it without being seen." (Ex. A Doc. 109-4 at

2-3). As Hollenback has since testified, based on the information provided by

Cutrer, Superior Traffic believed the AFADs were outside of the fence and did not

realize they were inside Southwest Safety's warehouse. Hollenback further testified that he did not instruct Cutrer to go on Superior Traffic's property, and would not have done so. (Ex. 18 Doc. 101-15 at 41 [155:9-16; 156:10-13]). Hollenback's testimony is consistent with Davis's text, which says nothing about going on Superior Traffic's property or entering its warehouse.

Site 2020 further contends that Superior Traffic and its counsel actively interfered with Site 2020's deposition of Biggers. (Doc. 108 at 17). Site 2020 asserts that during the hearing on May 17, 2022, Superior Traffic's counsel mischaracterized Biggers' employment position and his role in the product demonstration. (Doc. 108 at 17). Superior Traffic concedes that, at the time of the hearing in May 2022, it mistakenly believed Biggers was a third-party sales representative and did not make the December 8, 2021 product demonstration. (Doc. 111 at 9). This inadvertent misstatement does not support Site 2020's argument that Superior Traffic and its counsel actively interfered with Site 2020's deposition of Biggers, which was accomplished on June 17, 2022. (Doc. 108 at 17).

Site 2020 additionally asserts that Superior Traffic has improperly targeted and attempted to steal its customers since the start of this litigation, but does not point to any evidence that Superior Traffic's conduct consisted of anything other than legitimate business competition.  To the extent Site 2020 further complains

that Superior Traffic improperly supplied Biggers with materials in advance of his deposition, it has not shown this was improper. As two cases cited by Superior Traffic reflect, it is not uncommon for an entity litigant to prepare an ex-employee for a deposition that is to be conducted in connection with events that took place while the individual was still an employee. See *Peralta v. Cendant Corp.*, 190 F.R.D. 38, 41 (D. Conn 1999); *Simmier, LLC v. Everest Indem. Ins. Co.*, 2021 WL 3773339, at *9 (N.D. Ohio Aug. 25, 2021). The Court therefore finds Site 2020 has not shown that Superior Traffic abused the judicial process or otherwise engaged in litigation misconduct, much less equivalent litigation misconduct, that might preclude it from pursuing sanctions against Site 2020.

Site 2020 also takes the position that no sanctions are warranted because, contrary to Superior Traffic's assertions, its actions have not undermined the integrity of these proceedings. (Doc. 108 at 23-25). Specifically, Site 2020 argues (1) it has not circumvented the discovery rules or deprived Superior Traffic of its right to counsel because it has not, and will not, use any of the information obtained during the product demonstration during this litigation; (2) Graham's attendance at the product demonstration was not related to this litigation, but rather for the purpose of analyzing Superior Traffic's products from a business perspective; and (3) Hollohan and Romkey testified truthfully at their depositions when questioned about the product demonstration. The Court addresses these

arguments below, in conjunction with its assessment of whether Superior Traffic has met its burden of demonstrating that Site 2020 acted willfully or in bad faith.

### 1.    Willfulness, Fault, or Bad Faith

As explained above, a finding of "willfulness, fault, or bad faith" is required before a court may impose terminating sanctions against a party under its inherent power. See *Leon*, 464 F.3d at 958. The Ninth Circuit has not ruled on whether such a finding must be supported by clear and convincing evidence or a preponderance of the evidence. *Lahiri v. Universal Music & Video Distribution Corp.*, 606 F.3d 1216, 1219 (9th Cir. 2010). Some district courts "have accordingly applied the preponderance of the evidence standard when evaluating whether a litigant acted in bad faith" for purposes of an inherent powers sanctions award, while others have applied a clear and convincing standard. *Pruco Life Ins. Co. v. California Energy Development Inc.*, 2022 WL 1037111 *9 (S.D. Cal. Apr. 6, 2022) (collecting cases). See also *In re Nelson Ricks Cheese Co. Inc.*, 2021 WL 1731765, at *3 (D. Idaho Apr. 30, 2021) ("Although the specific burden of proof is unsettled in the Ninth Circuit, the general view is that bad faith or willful misconduct must be proven by clear and convincing evidence.")

Here, the Court has no difficulty finding by clear and convincing evidence that Site 2020 acted willfully and in bad faith. Superior Traffic has produced evidence demonstrating that while this litigation was pending, Site 2020 accepted

Superior Traffic's offer to demonstrate its AFAD product to what it thought was a potential customer, Southwest Safety. Unbeknownst to Superior Traffic, Site 2020 had acquired a controlling interest in Southwest Safety, and Site 2020's chief operating officer, Romkey, had assumed operational control of Southwest Safety. Thompson went so far as to tell Biggers before the meeting that Southwest Safety was no longer under contract with Site 2020, thereby falsely portraying that it was at arm's length from Superior Traffic's litigation opponent, when in fact the two were affiliated.  Neither Site 2020 nor Southwest Safety disclosed this relationship to Superior Traffic before, during, or after the product demonstration.

In the days leading up to the product demonstration, Site 2020 arranged to have its operations manager, Graham, attend the meeting posing as a Southwest Safety employee. Emails exchanged between Hollohan, Romkey, and others prior to Superior Traffic's product demonstration reflect that they were both directly involved in planning to have Site 2020's field operations manager, Graham, attend the demonstration posing as a Southwest Safety employee. For instance, Hollohan and Romkey were part of or copied on the email exchange during which (1) Graham advised Thompson he would come up with a fake name; (2) Thompson expressed concern about what to do with Site 2020's equipment; and (3) Hollohan advised telling Biggers that he could not come in the warehouse because of Covid-19. (Ex. 9 Doc. 101-6). In addition, Hollohan received an email string including

28

Romkey's email to Graham on the morning of the demonstration asking "All set

up? You got game plan?" (Ex. 10 Doc. 101-7).

Site 2020's IT department created a Southwest Safety email address for

Graham's fictional persona, Mike Evans, which Graham used to communicate with

Superior Traffic prior to the meeting. Shortly before Hollenback and Biggers

arrived for the product demonstration at Southwest Safety's warehouse, Graham

installed a GoPro audiovisual recording device in the area where the meeting was

set to take place. At no point did Graham advise Hollenback or Biggers that he was

recording their demonstration of the very AFAD product that is the subject of Site

2020's patent infringement claims. As detailed above, Graham elicited information

about Superior Traffic's AFAD technology that is directly relevant to those patent

infringement claims and, unbeknownst to Superior Traffic, promptly provided

much of that information, including the audiovisual recording, to the rest of Site

2020's leadership.

Through its deceptive conduct, Site 2020 circumvented the Federal Rules of

Civil Procedure governing discovery and interfered with Superior Traffic's right to

be represented by counsel. As reflected in the audiovisual recording, Site 2020

effectively obtained a lengthy undisclosed recorded interview of its litigation

opponent's president and chief operating officer on matters related to the merits of

its patent infringement claims. Additionally, the narratives that Graham elicited

from Hollenback and Biggers during the product demonstration amounted to an extended preview of their demeanor and manner of presentation as witnesses.

Even after the product demonstration, Site 2020's deceptive conduct continued. After Superior Traffic retrieved its AFAD units from Southwest Safety's premises, Graham continued to present himself as Mike Evans and, on instructions from Romkey and Edelman, pressed Davis to return the units and continued to falsely portray Southwest Safety as arm's length from Site 2020.

The deceptive conduct of Site 2020's leadership still has not abated, as reflected in the deposition testimony submitted by the parties. In particular, the Court has reviewed the video and transcribed deposition testimony provided by Romkey and Hollohan in March 2022, along with their sworn statements, and finds they are not credible witnesses.

When asked "Do you know whether Mr. Quinn [sic] identified himself to Superior Traffic as a representative of Site 2020?" at the December 8, 2021 meeting, Romkey answered "I would be shocked if he did … but I don't have specific knowledge on that." (Ex. 24 Doc. 101-19 at 51 [195:23-196:8]).  Contrary to Site 2020's argument that this was a truthful statement, the Court finds Romkey's testimony is demonstrably false in light of uncontroverted deposition and email evidence that he knew full well Graham was going to attend the meeting under false pretenses.

Likewise, when asked "Do you know if Superior Traffic was ever informed that he [Graham] was at that meeting?" Romkey responded, "Well, he was there, so I assumed they were informed." (Ex. 24 Doc. 101-19 at 50 [191:5-9]).  The Court finds this testimony is demonstrably false because the record reflects that Romney knew Superior Traffic had been informed that "Mike Evans" of Southwest Safety was attending the meeting.

Finally, the Court notes that Romkey responded to the question, "What is Site 2020's relationship with Southwest Safety?" by answering, "They're a customer" – again obscuring the known affiliation between Site 2020 and Southwest Safety. (Ex. 24 Doc. 101-19 at 35 [132:15-17]). Having watched relevant portions of Romkey's videotaped deposition and reviewed the deposition transcript, the Court finds that Romkey is not a credible witness.

The same is true for Hollohan. For example, when Hollohan was asked during his deposition "Do you know whether Mr. Graham identified himself to Superior Traffic as a representative of Site 2020 at that demo?", he responded "I have no idea. No idea." (Ex. 25 Doc. 101-20 at 58 [222:23-223:1]).  Based on the evidence discussed above, and having watched relevant portions of Hollohan's videotaped deposition and reviewed the transcript, the Court finds his testimony that he has no idea whether Graham identified himself as a representative is not credible.

In response to questions about the circumstances leading up to the December 8, 2021, meeting and whether he knew Graham planned on attending, Hollohan answered evasively. Hollohan explained that he "was extremely removed from this one," and repeatedly stated that his information about the meeting was "thirdhand." (Ex. 25 Doc. 101-20 at 55 [212:18-213:9]). Hollohan repeatedly equivocated on the issue of Graham's attendance, testifying for example: (1) "I think there was a chance Quinn [Graham] wasn't even going to be there" (Ex. 25 Doc. 101-20 at 55 [213:14-15]); (2) "[T]here was a chance that he was going to be there for the meeting, but I don't think it was a planned… I don't think it was a planned meeting that Quinn [Graham] quote-unquote, set up" (Ex. 25 Doc. 101-20 at 56 [214:13-19]); (3) "[F]rom what I'm getting from thirdhand information, was that Quinn [Graham], if he was in town, was going to attend the meeting (Ex. 25 Doc. 101-20 at 56 [215:7-9]); (4) the extent of his knowledge prior to the meeting was that if Quinn [Graham] was in town, he would attend the product demonstration, but if he was not in town, he would not attend (Ex. 25 Doc. 101-20 at 56 [216:15-20]); (5) "there was no specific plan" for Graham to attend the meeting (Ex. 25 Doc. 101-20 at 57 [220:9]); and (6) Graham was "like hey, if I'm in town – like this is probably exactly the way the conversation went. Hey, I'm in town. If I'm in (indiscernible) when the Superior guys come in town, I'm going to be there for the demo. If not, I won't be there. I was like, okay, cool. (Ex. 25 Doc. 101-20 at 57 [221:22-222:2]).

The Court finds that Hollohan's testimony as to the extent of his involvement in planning the meeting and his knowledge about Graham's attendance is not credible. Superior Traffic has submitted evidence demonstrating that Hollohan was directly involved in the plan to have Graham attend the meeting by, for example, providing Graham with questions to ask at the meeting and asking Graham to share what he learned during the meeting. (Ex. 6 Doc. 101-4 at 7 [20:11-21:8], 10 [31:15-33:9], 11 [34:2-21, 35:2-6]; Ex. 9 Doc. 101-6 at 2; Ex. 10 Doc. 101-7 at 2; Ex. 11 Doc. 101-8). Graham's deposition testimony and email exchanges prior to the meeting reflect that Hollohan received information about the meeting directly from Graham, not "thirdhand." (Ex. 6 Doc. 101-4, 7 [20:11-21:8], 10 [31:15-33:9], 11 [34:2-21], 18 [63:8-64:6], 19 [69:11-70:18], 28 [105:13-23]; Ex. 9 Doc. 101-6; Ex. 10 Doc. 101-7; Ex. 11 Doc. 101-8). Contrary to Hollohan's testimony, this evidence demonstrates there was no uncertainty as to whether Graham would attend the meeting, and that Site 2020 planned for Graham to attend under false pretenses. Accordingly, and for the reasons detailed above, the Court finds that Hollohan's testimony is not credible.

Hollohan and Romkey are not the only witnesses to have been evasive when testifying about matters relating to the product demonstration. During his deposition on May 12, 2022, Thompson testified as follows under questioning by counsel for Superior Traffic:

Q.      [] Do you know whether Quinn [Graham] introduced himself to Jeff
        [Hollenback] and Mike [Biggers] as Quinn Graham?
A.      I don't know that.
Q.      Do you know how he introduced himself to Jeff and Mike?
A.      I do not know that. I wasn't there.

(Ex. 1 Doc. 101-1 at 18 [63:7-12]). Thompson's testimony flatly contradicts the

video of the product demonstration, which reflects that Thompson *was* there, and it

was he who introduced Graham as Mike Evans to Hollenback and Biggers.

Although Thompson was not directly affiliated with Site 2020, he was the sales

manager for Southwest Safety, which had been acquired by Site 2020 more than

six months earlier.

Site 2020 nevertheless contends that its actions have not undermined the

integrity of these proceedings, and do not amount to willful deceit or bad faith

litigation conduct for a number of reasons. (Doc. 108 at 23-25, 35). Site 2020 does

not disagree that Superior Traffic provided information that could be considered

relevant to the merits of the case during its demonstration of the accused AFAD,

but stands by its position that Graham's "attendance at the demonstration was not

in any way related to present litigation and Site 2020 did not seek to elicit

information to be used in connection with any of the parties' respective claims."

(Doc. 108 at 10). Graham has testified that at the time of the meeting in December

2021, he was not aware that Site 2020 was in active litigation with Superior

Traffic. (Ex. H Doc. 108-4 at 19 [18:4-9]). Graham and Romkey have both

testified that Graham did not attend the meeting for litigation-related purposes, but rather to competitively analyze Superior Traffic's AFAD products from a business perspective. (Ex. H. Doc. 108-4 at 19 [18:4-6], 20 [19:3-19], 35 [34:2-35:1]; 77 [76:16-18]; 120 [119:12-23]; 153-154 [152:5-153:15]; Ex. I. Doc. 108-5 at 193-94 [192:23-193:15], 196-96 [194:8-195:15]; Doc. 109-2 at ¶ 7).

The Court finds Site 2020's assertion that Graham's attendance at the meeting was unrelated to its pending lawsuit against Superior Traffic and was orchestrated solely for the purpose of competitively analyzing Superior Traffic's AFAD products is not supported by the record. Even assuming Graham was not personally aware of the pending litigation, the same cannot be said of Hollohan and Romkey. Site 2020 does not claim that Hollohan and Romkey were unaware of the lawsuit, and the record reflects that they were directly involved in the plan to have Graham attend the meeting under false pretenses, posing as a Southwest Safety employee. And as explained above, the Court finds Romkey's and Hollohan's deposition testimony that they did not know whether Graham introduced himself at the meeting as a representative of Site 2020 is not credible.

Site 2020 further emphasizes that Superior Traffic "makes no claim that Site 2020 has ever used – or attempted to use – any [of the] information [obtained during the meeting] in connection with this lawsuit." (Doc. 108 at 23). Site 2020 argues it would have obtained all of the information provided by Superior Traffic

35

during the meeting through the normal course of discovery, and even before the meeting it already had enough evidence to prosecute its patent infringement claims. Because it has not used any of the obtained during the meeting in litigating its claims, Site 2020 contends, it has not interfered Superior Traffic's right to counsel.

Even accepting Site 2020's assertion that it has not and will not use any information obtained during the meeting with Superior Traffic in this litigation, this does not change the fact that Site 2020's principals willfully engaged in deceptive conduct toward an opposing party during the course of litigation, circumvented the discovery rules to obtain information relevant to the merits of Site 2020's claims, and in doing so deprived Superior Traffic of the benefit of counsel. That Site 2020 may well have obtained some or all of the same information legitimately during discovery at some later stage in the litigation does not excuse its willful misconduct, which is tantamount to bad faith and has undermined the integrity of these proceedings.

As is often true where one party requests sanctions based on another party's litigation misconduct, the specific factual circumstances at issue here are unique. The Court nevertheless finds that the primary case Superior Traffic relies on to support its argument that Site 2020 has engaged in sanctionable litigation misconduct is analogous and persuasive. *Xyngular Corp. v. Schenkel*, 200

F.Supp.3d 1273 (D. Utah 2016), *aff'd*, 890 F.3d 868 (10th Cir. 2018). In *Xyngular*,

the defendant sought terminating sanctions under the court's inherent authority,

asserting that a third-party plaintiff had wrongfully encouraged one of the

defendant's employees to remove documents from the plaintiff's servers, "and then

collected, reviewed, and used those documents in support of his claims" in the

case. *Xyngular*, 200 F.Supp.3d at 1311. The plaintiff admitted he was anticipating

litigation against the defendant when he was collecting the documents. *Xyngular*,

200 F.Supp.3d at 1317. The court concluded the plaintiff had acted willfully and in

bad faith, and that sanctions were appropriate because he had "undermined the

legitimacy of the[] proceedings and skirted the discovery process." *Xyngular*, 200

F.Supp.3d at 1317. The court cautioned that litigants "may not engage in self-help

by improperly gathering a potential adversary's property," explaining:

> This conduct is an affront to the established rules of engagement and fair
> play in lawsuits. It amounts to an end-run around the Federal Rules of Civil
> Procedure, including the rules governing discovery and the orderly exchange
> of information relevant to disputes presented for resolution in our courts.
> This conduct undermines the confidence of both litigants and the public in
> the fairness of judicial proceedings.

*Xyngular*, 200 F.Supp.3d at 1317. The court found by clear and convincing

evidence that the plaintiff had "acted willfully, in bad faith, and with fault in a way

that abuses the judicial process and undermines the legitimacy of [the]

proceedings, and in doing so had committed sanctionable misconduct that

37

ultimately warranted dismissal of the plaintiff's claims. *Xyngular*, 200 F.Supp.3d at 1319, 1323.

Site 2020 argues *Xyngular* is distinguishable because the plaintiff in that case used the documents he wrongfully obtained to support his claims. Unlike *Xyngular*, Site 2020 contends it has not used, and will not use, any of the information it learned during the December 2021 meeting to advance its position in this litigation, unless the information was otherwise obtained during the normal course of discovery. Even assuming this is true, it does not excuse Site 2020's conduct. Regardless of whether Site 2020 uses the information in obtained during the meeting to support its claims, the fact remains that Site 2020's principals willfully engaged in deceptive conduct toward an opposing party during the course of litigation, circumvented the discovery rules to obtain relevant information, and in doing so deprived Superior Traffic of the benefit of counsel.

For these reasons, the Court finds by clear and convincing evidence that Site 2020 acted willfully and in bad faith. Site 2020 deliberately engaged in deceptive practices that have undermined the integrity of these judicial proceedings, and its misconduct was utterly inconsistent with the orderly administration of justice. Site 2020 should be sanctioned under the Court's inherent authority for its litigation misconduct. Having concluded that Site 2020 engaged in sanctionable misconduct,

the Court turns next to the Ninth Circuit's five-factor test to determine whether the terminating sanctions Superior Traffic requests are appropriate.

### 2.    Five-Factor Balancing Test

In determining the appropriate sanction, the Court considers the following factors: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." *Leon*, 464 F.3d at 958. However, a "district court does not need to make explicit findings regarding each of these factors." *Leon*, 464 F.3d at 958.

"The first two of these factors favor the imposition of sanctions in most cases, while the fourth cuts against a … dismissal sanction. Thus the key factors are prejudice and the availability of lesser sanctions." *Wanderer v. Johnston*, 910 F.2d 652, 656 (9th Cir. 1990). Site 2020's misconduct has led to time consuming sanctions-related litigation, and has made it impracticable for the Court to adhere to the previously established schedule. Thus, as is typically the case, the first two factors weigh in favor of terminating sanctions. See *Leon*, 464 F.3d at 959 n. 5 (finding the first two factors satisfied where the plaintiff's conduct led to "months of sanctions-related litigation"); *Malone v. U.S. Postal Serv.*, 833 F.2d 128, 131 (9th Cir. 1987) (finding the first two factors satisfied where the trial court was

prevented from adhering to its trial schedule). As always, "[t]he fourth factor, the resolution of cases on their merits," weighs against terminating sanctions. *Derith v. Nu Image, Inc.* 648 F.3d 779, 788 (9th Cir. 2011).

The level of sanctions warranted thus turns on the two key factors: the risk of prejudice to Superior Traffic and the availability of less drastic sanctions.

        a.   <u>Prejudice</u>

When evaluating the risk and degree of prejudice to the party seeking sanctions, courts look to whether the responding party's actions have "impaired the [moving party's] ability to go to trial or threatened to interfere with the rightful decision of the case." *Leon*, 464 F.3d at 959. See *Anheuser-Busch, Inc.,* 69 F.3d at 348 (quoting *Wyle v. R.J. Reynolds Indus. Inc.*, 709 F.2d 585, 591 (9th Cir. 1983) ("Due process concerns ... require that there exist a relationship between the sanctioned party's misconduct and the matters in controversy such that the transgression 'threaten[s] to interfere with the rightful decision of the case.'").

Superior Traffic argues it has been prejudiced by Site 2020's misconduct in four ways: (1) Site 2020 obtained relevant information without complying with the procedures for obtaining discovery set forth in the Federal Rules of Civil Procedure -- "for example, by obtaining extended narratives it never could have gotten in a deposition"; (2) Site 2020 denied it the benefit of counsel on technological and commercial subject matter; (3) Site 2020 obtained a free advance

look at the demeanor and presentation of Hollenback, one of its central witnesses, and; (4) Site 2020's misconduct fundamentally undermined Superior Traffic's belief in the integrity of the litigation process. (Doc. 106 at 36). The Court agrees.

As argued by Superior Traffic, it was inherently prejudicial for Site 2020 to obtain information relevant to the merits of its patent infringement claims without complying with the rules governing discovery. See *Xyngular*, 200 F.Supp.3d at 1321 (finding prejudice where the plaintiff "[blew] past the rules governing discovery and the parties' right to a neutral forum for resolving discovery disputes" and obtained documents that were relevant to the disputed claims). As a result of Site 2020's failure to comply with the discovery process, Superior Traffic was denied the benefit of legal counsel during a lengthy meeting with its litigation opponent on subject matters related to the merits of the ongoing case between them. In addition, Site 2020 surreptitiously obtained an advance look at the demeanor and presentation of Hollenback, one of Superior Traffic's key witnesses, to Superior Traffic's detriment.

The prejudice Superior Traffic has suffered because of Site 2020's misconduct cannot be minimized. At one point during the sanctions hearing, counsel for Site 2020 inadvertently highlighted the significance of Site 2020's misconduct when addressing Romkey's deposition testimony. (Doc. 124 at 56). Counsel rightly explained that a "deposition … is not like a normal conversation.

41

Your obligation under oath is to tell the truth in response to the question that is asked . . . Did [Superior Traffic] have to push [Romkey] occasionally? Who doesn't have to push a witness to get information?" (Doc. 124 at 56:10-23). This distinction between the adversarial formality of a deposition taken in accordance with established discovery rules and with the benefit of counsel, and unstructured questions and narrative answers during a meeting where one party is attempting to persuade the other to enter into a business relationship, aptly illustrates why Site 2020's conduct towards Superior Traffic, its litigation opponent, was so prejudicial.

Site 2020's misconduct has undermined the integrity of the litigation process, including Superior Traffic's confidence in the federal judicial system. (Ex. 18 Doc. 101-15 at 62 [238:20-239:14). Hollenback states in a supporting declaration that Site 2020's conduct was not consistent with his "expectations of how the civil litigation process is supposed to work," and has left him "feel[ing] personally violated, as though I had been spied or eavesdropped on at home or in a hotel room." (Ex. 32 Doc. 99-33 at ¶¶ 6, 11). Given Site 2020's conduct, Hollenback has reasonably lost confidence that any confidential information conveyed to Site 2020 during the course of this litigation will remain confidential. (Ex. 18 Doc. 101-15 at 52 [200:1-8], 62 [238:20-239:14], 66-67 [256:24-257:10, 258:7-11]; Ex. 32 Doc. 99-33 at ¶ 11).

In an apparent attempt to minimize the impact of its misconduct, Site 2020 asserts that Superior Traffic did not provide any confidential or proprietary business information during the product demonstration, and so everything discussed during the meeting either has been, or could have been, obtained through the normal course of discovery. Even assuming Site 2020 is correct that all of the information provided during the meeting would have been discoverable, Superior Traffic's interest in being represented by counsel during the discovery process while discussing such information with a party opponent was materially and substantially prejudiced. Thus, to the extent Site 2020 asserts Superior Traffic has not been prejudiced because much of the information it obtained during the meeting would have been produced during discovery, the Court disagrees. See *Xyngular*, 200 F.Supp.3d at 1321 (rejecting essentially the same argument and finding prejudice based on the plaintiff's "unauthorized possession and possible use of" information that was wrongfully obtained).

Likewise, to the extent Site 2020 argues Superior Traffic has not suffered any prejudice  as a result of Site 2020's misconduct because Site 2020 has not used, and will not use, any of the information it obtained during the meeting to supports its claims, the Court is not persuaded. Other district courts have rejected such a "no harm, no foul" approach to assessing prejudice and the propriety of granting terminating sanctions. In *American Rena International Corp. v. Sis-Joyce*

43

*International Co., Ltd.,* 2015 WL 12732433, at *28 (C.D. Cal. Dec. 14, 2015), for example, the defendants argued their conduct in filing fraudulent declarations had not caused any prejudice to the plaintiffs because the "declarations were not actually relied on by the courts and [were] therefore inconsequential." The court rejected the defendants' "no harm, no foul" argument, finding that the defendants' position exhibited "disrespect for the legal process." *American Rena*, 2015 WL 12732433, at *29.

Under the circumstances, the Court finds the fact that Site 2020 has not used, and claims it will not use, any evidence obtained during the December 2021 product demonstration in this litigation does not mean there has been no prejudice to Superior Traffic. To the contrary, and for the reasons discussed, the Court finds Superior Traffic has been substantially prejudiced by Site 2020's conduct, which has fundamentally undermined the integrity of these proceedings and is utterly inconsistent with the orderly administration of justice. See *Xyngular*, 200 F.Supp.3d at 1317 (recognizing there are "established rules of engagement and fair play in lawsuits" and that failure to comply with these rules is an abuse of "the judicial process and impugns the integrity of [judicial] proceedings.").

Finally, Site 2020 counters that there is no risk of prejudice to Superior Traffic because it has legal recourse to address Site 2020's misconduct by asserting tort counterclaims. This argument misses the mark. While Superior Traffic could

have merely sought leave of Court to assert tort counterclaims as a sole remedy for Site 2020's litigation misconduct, it was not required to do so. Instead, Superior Traffic has permissibly chosen to pursue case terminating sanctions to redress the prejudice it has suffered as a result of Site 2020's conduct.

For the reasons stated above, the Court finds that Superior Traffic has been substantially prejudiced by Site 2020's bad faith litigation misconduct. This factor thus weighs heavily in favor of a case terminating sanction.

        b.    <u>Availability of Lesser Sanctions</u>

The final factor, the availability of less drastic sanctions, requires the Court to consider "the feasibility of less drastic sanctions" and, if terminating sanctions are granted, explain why alternative sanctions would not be effective. *Leon*, 464 F.3d at 960.

Superior Traffic's request for sanctions is twofold. It asks the Court to (1) dismiss Site 2020's claims with prejudice; and (2) enter default judgment against Site 2020 on Superior Traffic's proposed Third Amended Counterclaims. (Doc. 98).

Assuming, as the Court has decided, that sanctions are warranted, Site 2020 argues the sanctions requested by Superior Traffic are too severe, and asserts there are less drastic sanctions available that would remedy any harm resulting from its conduct. In addition to possible monetary sanctions or possible adverse inference

instruction, Site 2020 proposes several lesser sanctions it contends would be sufficient:

(1)     An express warning or explicit order from the Court regarding the conduct alleged in Superior Traffic's motion;

(2)     Expansion of written discovery limitations to allow Superior Traffic to adequately investigate and pursue any potential legal claims it believes arise as a result of the conduct alleged in its motion;

(3)     An order granting Superior Traffic leave to amend its operative pleadings to include additional allegations and/or assert additional counterclaims in connections with the December 8, 2021 demonstration;

(4)     Expansion of the number of depositions available to Superior Traffic in connection with this litigation such that the depositions of Thompson and Graham do not impact Superior Traffic's ability to pursue depositions of others in support of its defenses and counterclaims;

(5)     An order from the Court that no information disclosed during the December 8, 2021 demonstration be used in any way by Site 2020 to support or deny a claim in this case – unless such information is otherwise learned through the course of discovery.

(Doc. 108, at 40-41).

The Court disagrees with Site 2020 that the above proposed sanctions, either standing alone or in combination, would provide an adequate remedy for the harm caused by its serious litigation misconduct. As discussed at length above, Site 2020 acted willfully and in bad faith, circumvented the rules of discovery, and deprived Superior Traffic of its right to counsel. In doing so, Site 2020 obtained information

that is directly relevant to the merits of its patent infringement claims against Superior Traffic.

The lesser sanctions proposed by Site 2020 would not be sufficient to remedy the prejudice that Superior Traffic has suffered as a result of this misconduct. Nor would such sanctions be sufficient to adequately deter future litigants from similar misconduct, and to protect the public's interest in fair judicial proceedings. *Xyngular*, 200 F.Supp.3d at 1325 (finding "[a]ny lesser sanction than dismissal [] would be an open invitation to abuse the judicial process because litigants would infer they have everything to gain and nothing to lose by trying to lie, cheat, and abuse the orderly rules of discovery."  See also *Lee v. Trees, Inc.*, 2017 WL 5147146, 2017 WL 5147146, at *8 (D. Ore. Nov. 6, 2017) (finding terminating sanctions appropriate "because any lesser sanction would suggest to future litigants that they may manufacture evidence and suffer no meaningful consequences if caught, because they would still be able to maintain a claim or defense against the opposing party – a message equivalent to the 'no harm, no foul' adage. Such an outcome would do nothing to dissuade such conduct in the future.").

The primary case Site 2020 cites to support its argument that terminating sanctions would be too drastic a remedy under the circumstances is inapposite. (Doc. 108 at 37-38, citing *Phocene Sous-Marine, S.A. v. U.S Phosomarine, Inc.*,

682 F.2d 802 (9th Cir. 1982)). In *Phocene*, the defendant willfully deceived the court as to his availability for trial. *Phocene*, 682 F.2d at 804-805. The Ninth Circuit reversed the district court's decision to impose default judgment as a sanction under its inherent power because the "deception related not to the merits of the controversy but rather to a peripheral matter: whether [the defendant] was in fact too ill to attend trial." *Phocene*, 682 F.2d at 806. The Ninth Circuit held that "entry of default as a sanction for a deception of the court on a matter wholly unrelated to the merits of the controversy is inconsistent with the requirements of due process." *Phocene*, 682 F.2d at 806.

Here, unlike *Phocene*, Site 2020 obtained information that is directly relevant to the merits of its patent infringement claims against Superior Traffic. Given the nature of Site 2020's misconduct and its relationship to the merits of the controversy, the Court finds the reasoning in *Xyngular*, which is the primary case relied on by Superior Traffic to support its position that dispositive sanctions are warranted is far more persuasive.

Because Site 2020 has "deliberately engaged in deceptive practices that undermine the integrity of [these] judicial proceedings" and has "engaged in conduct utterly inconsistent with the orderly administration of justice," the Court finds that terminating sanctions as to Site 2020's patent infringement claims against Superior Traffic are appropriate. *Leon*, 464 F.3d at 958. See also *Anheuser-*

*Busch,* 69 F.3d at 348 (quoting *Wyle*, 709 F.2d at 591) ("It is well settled that dismissal is warranted where … a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings: 'courts have inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice'.").

In addition to dismissal of Site 2020's claims, Superior Traffic requests sanctions in form of a default judgment on all 17 of its counterclaims, which include the following: (1) declaratory judgment of non-infringement of U.S. Patent No. 10,249,186 ("the '186 Patent"); (2) declaratory judgment of non-infringement of U.S. Patent No. 11,055,993 ("the '993 Patent"); (3) declaratory judgment of invalidity of the '186 Patent; (4) declaratory judgment of invalidity of the '993 Patent; (5) declaratory judgment of unenforceability of the '186 Patent; (6) declaratory judgment of unenforceability of the '993 Patent; (7) false advertising and unfair competition under 15 U.S.C. § 1125(A)(1)(B); (8) false advertising under Mont. Code Ann. § 30-14-101 *et seq.*; (9) injurious falsehood; (10) tortious interference with business expectancies; (11) unfair competition under Mont. Code Ann. § 30-14-101 *et seq.*; (12) unfair competition under Montana common law; (13) unfair restriction on trade under Sherman Act § 1, 15 U.S.C. § 1 *et seq.*; (14) attempted monopolization under Sherman Act § 2, 15 U.S.C. § 2 *et seq.*; (15)

unlawful contract under Clayton Act § 3, 15 U.S.C. § 14 *et seq*.; (16) unjust enrichment under Montana common law and Mont. Code Ann. § 27-1-602; and (17) infringement of the '817 Patent. (Second Amended Counterclaims, Doc. 47 at 57-72; proposed Third Amended Counterclaims, Doc. 80-1 at 59-74).

Superior Traffic asks the Court to enter default judgment in its favor and against Site 2020 on all 17 counterclaims. Superior Traffic proposes three alternatives in descending order of preference: (a) a default judgment establishing a presumption of truth as to the allegations of its counterclaims, leaving only the issue of remedies on the counterclaims to be established at an evidentiary hearing, including any related briefing; (b) or as a less preferred alternative, a default judgment after an evidentiary hearing (including any related briefing) at which Superior Traffic may present its prima facie case on liability and its entitlement to remedies; (c) or, as an even less preferred alternative, a default judgment that Superior Traffic has established its prima facie case that Site 2020 is liable on its counterclaims, leaving Site 2020 to disprove liability. (Doc. 98 at 2-3).

Having considered Superior Traffic's proposals, the Court finds that entering judgment on any of Superior Traffic's counterclaims is too severe of a sanction under the circumstances. The prejudice Superior Traffic has suffered as result of Site 2020's conduct will be adequately remedied by dismissing Site 2020's patent

infringement claims, leaving Superior Traffic to litigate its counterclaims against Site 2020 if it chooses to do so.

As discussed above, the Court has determined that Site 2020 willfully engaged in conduct that is utterly inconsistent with administration of justice. The Court also recognizes that in doing so, Site 2020 has undermined the integrity of the litigation process, including Superior Traffic's confidence in the federal judicial system. If Site 2020's claims against Superior Traffic are not dismissed, Superior Traffic will be in the untenable position of having to defend itself against patent infringement claims asserted by a party opponent who has not litigated those claims in good faith. The prejudice that Superior Traffic would suffer if it were put in such a position can be adequately remedied by dismissing Site 2020's claims, thereby putting Superior Traffic purely in the position of a plaintiff as to its counterclaims. As the plaintiff, Superior Traffic can choose whether to continue litigating some or all of its claims against Site 2020.

For these reasons, the Court finds that dismissing Site 2020's claims but declining to enter any form of default judgment on Superior Traffic's counterclaims is the least onerous effective sanction that can be imposed under the circumstances. See *Renner v. Takeda v. Pharmaceuticals U.S.A. Inc.*, 2017 WL 120852, at *5 (D. Mont. Jan. 12, 2017) (recognizing that imposing the "least

onerous effective sanction" is reflective of the court's obligation "to exercise its inherent powers with restraint and discretion.").

In sum, the public's interest in expeditious resolution of litigation, the Court's need to manage its docket, the prejudice to Superior Traffic, and the unavailability of less drastic sanctions all weigh in favor of dismissing Site 2020's claims as a sanction for its litigation misconduct. Although the public policy favoring disposition of cases on their merits weighs against dismissal – as it always does – this factor is heavily outweighed by the other four.

III.   **Motion for Leave to File Third Amended Counterclaims**

A.   **Background**

Superior Traffic's original and First Amended Counterclaims, filed in June 2021 and August 2021, respectively, did not include any counterclaims for patent infringement. (Docs. 15 and 30). In September 2021, Superior Traffic sought and obtained leave under Federal Rule of Civil Procedure 15(a) to file Second Amended Counterclaims to add a patent infringement counterclaim against Site 2020. (Doc. 44; Doc. 46). As pled in its Second Amended Counterclaims, Superior Traffic's patent infringement counterclaim accuses Site 2020's portable traffic light product, the Guardian PTL of infringing the '817 Patent. (Doc. 47, at 71 ¶ 137).

In mid-April 2022, approximately two weeks after the Court recommended denying Site 2020's subsequent Rule 12(b)(6) motion to dismiss Superior Traffic's patent infringement counterclaim (Doc. 72), Superior Traffic filed the pending motion for leave to file Third Amended Counterclaims. (Doc. 78). Superior Traffic asserts that when it filed its motion to amend in April 2022, it had only recently learned that Site 2020's Guardian PTL was never commercialized. Superior Traffic therefore seeks leave to amend its patent infringement counterclaim to instead identify Site 2020's flagship traffic management system – the Guardian SmartFlagger – as the accused product.

Superior Traffic also seeks to include new factual allegations regarding Site 2020's business operations and allegedly deceptive trade practices. (Doc. 80-2 at 52 ¶ 105-112).

### B.    Legal Standard

Federal Rule of Civil Procedure 15(a) provides that leave to amend a pleading "shall be freely given when justice so requires." As interpreted by the Ninth Circuit, Rule 15(a) creates a liberal policy in favor of granting leave to amend. See *Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989); *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). Whether to grant leave to amend is left to the court's discretion. *Ditto v. McCurdy*, 510 F.3d 1070, 1079 (9th Cir. 2007). In determining whether to grant

leave to amend, the Ninth Circuit instructs courts to consider the following factors:
(1) bad faith; (2) undue delay; (3) prejudice to the opposing party; (4) futility of
amendment; and (5) whether the plaintiff has previously amended the complaint.
*U.S. v. Corinthian Colleges*, 655 F.3d 984, 995 (9th Cir. 2011).  Of these five
factors, it is "the consideration of prejudice to the opposing party that carries the
greatest weight." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th
Cir. 2003). Absent prejudice, or a strong showing of any of the remaining factors,
there is a presumption "in favor of granting leave to amend." *Eminence Capital*,
316 F.3d at 1052.

 If a party seeks leave to file an amended pleading after the deadline
established by the scheduling order has passed, however, Rule 16(b) provides the
controlling standard. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1294 (9th Cir.
2000); *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607-08 (9th Cir.
1992). Rule 16(b) requires that a party show good cause for amending the
scheduling order to allow the filing of an amended pleading.  *Coleman*, 232 F.3d at
1294. "Unlike Rule 15(a)'s liberal amendment policy which focuses on the bad
faith of the party seeking to interpose an amendment and the prejudice to the
opposing party, Rule 16(b)'s 'good cause' standard primarily considers the
diligence of the party seeking the amendment...." *Johnson*, 975 F.2d at 607.

   **C.    Discussion**

The parties disagree on the threshold issue of what standard the Court should apply to determine whether Superior Traffic should be granted leave file its Third Amended Counterclaims. Superior Traffic argues the liberal standard for amendment set forth in Rule 15(a) should apply, while Site 2020 takes the position that Superior Traffic should be held to a more stringent "good cause" standard for amending its counterclaims.

The scheduling order that was in place at the time Superior Traffic filed this motion did not establish a deadline for amending the pleadings as required to trigger a "good cause" analysis under Rule 16. (Doc. 40).  Given that there was no court-ordered deadline for amending the pleadings, Site 2020 does not argue for application of Rule 16. Instead, Site 2020 cites several patent infringement cases applying a heightened "good cause" standard for amending infringement contentions and asks the Court to apply that standard here. (Doc. 81, at 18). Like the "good cause" inquiry under Rule 16, the standard applied in the cases cited by Site 2020 considers the diligence of the party seeking leave to amend its infringement contentions. See *Philips N. Am. LLC v. Fitbit* LLC, 2021 WL 5417103, at *3 (D. Mass. Nov. 19, 2021); *Abbott Diabetes Care Inc. v. Roche Diagnostics Corp.*, 2007 WL 2221029, at *1 (N.D. Cal. July 30, 2007); *GoPro, Inc. v. 360Heros, Inc.*, 2017 WL 1278756, at *2 (N.D. Cal. Apr. 6, 2017); *Angioscore, Inc. v. TriReme Med., Inc.*, 2015 WL 75187, at *5 (N.D. Cal. Jan. 6,

2015); *Thermapure, Inc. v. Giertsen Co. of* Illinois, 2012 WL 6196912, at *4 (N.D. Ill. Dec. 11, 2012); *Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.*, 2014 WL 4773960, at *2 (N.D. Cal. Sept. 19, 2014)).

Superior Traffic argues these cases are inapposite, however, because they are from districts with local patent rules that allow amendment of infringement contentions only upon a showing of good cause. This is a valid and material distinction. In each case cited above, the court denied a motion to supplement or amend infringement contentions, and in doing so applied local district court patent rules requiring the moving party to show good cause. Unlike the districts in those cases, the District of Montana has not adopted a comprehensive set of local patent rules to guide the Court's inquiry. Notably, the pretrial scheduling order that was in place when Superior Traffic filed its motion to amend in mid-April 2022 did not establish a deadline for amending the pleadings. (Doc. 40). That order has since been vacated, and there is no pretrial schedule currently in place.

Because no court ordered deadline for amending the pleadings was ever set, Rule 16 does not apply. But even if it did, Superior Traffic has demonstrated good cause for allowing it to file its proposed Third Amended Counterclaims.

### 1.   Good Cause

Whether derived from Rule 16 or the patent cases cited by Site 2020, a heightened good cause standard for amending the pleadings focuses on the

diligence of the party seeking leave to amend. See e.g. *Johnson*, 975 (discussing Rule 16's good cause standard); *Philips*, 2021 WL 5417103, at *3 (discussing the good cause standard embodied in the federal district court's local patent rules).

Site 2020 argues Superior Traffic was not diligent in seeking leave to amend because it has known of the Guardian SmartFlagger product since this litigation first began in May 2021, but did not seek to accuse the Guardian SmartFlagger of infringement until nearly a year later, in April 2022 – approximately two months before fact discovery was set to close and after *Markman* briefing was complete.[8] Superior Traffic does not dispute that it was aware of the Guardian SmartFlagger when it first asserted its patent infringement counterclaim in September 2021, but claims it was not aware of information in the public domain at that time suggesting that the Guardian SmartFlagger could be integrated into a remotely-operated network watcher traffic system and was therefore infringing on the '817 Patent.

 Superior Traffic explains that in mid-August 2021, Site 2020 posted a video to Facebook introducing its newest product, the Guardian PTL. Hollohan discussed the Guardian PTL's expected features during the video, and several days later he appeared on a local news show where he further explained that the Guardian PTL

---

[8] Pursuant to the Scheduling Order in place when Superior Traffic filed its motion for leave to amend on April 14, 2022, fact discovery was set to close on June 24, 2022, expert discovery was set to close on September 16, 2022, and trial was set for March 13, 2023. (Doc. 40).

would be capable of being operated by, and communicating with, a centralized traffic management system that is remote from a worksite. (Doc. 47 at ¶¶ 58-60). Based on that publicly available information, Superior Traffic had a reasonable basis for believing that the Guardian PTL infringed certain claims of the '817 Patent, and therefore identified the Guardian PTL as the accused product when it filed its Second Amended Counterclaims on September 15, 2021. (Doc. 80-3 at ¶¶ 2-3).

Superior Traffic served Site 2020 with its first set of discovery requests on September 17, 2021, and a second set of discovery requests on November 26, 2021. (Doc. 80-3 at ¶¶ 5, 6). In both sets of discovery requests, Superior Traffic asked Site 2020 to produce documents and information that would permit it to identify each Site 2020 accused product. (Doc. 80-3 at ¶¶ 5-6). To preserve its ability to pursue claims against all infringing Site 2020 products, Superior Traffic broadly defined the accused systems in its October 2021 preliminary infringement contentions as including the Guardian PTL "and/or the Guardian SmartFlagger." (Doc. 80-4, at 5-6). On December 7, 2021, Site 2020 produced documents relating to the Guardian SmartFlagger for the first time. (Doc. 80-3 at ¶ 7).

Approximately one month later, on January 6, 2022, Site 2020 stated in response to a Superior Traffic interrogatory that its Guardian PTL "is presently in in a prototyping phase of development and … has not been manufactured,

imported, or sold in the United States" and therefore cannot infringe the '817 Patent. (Doc. 80-5 at 54). Superior Traffic served deposition notices on Romkey and Hollohan a few days later, and took their depositions during the first week of March 2022. (Doc. 8-3 at ¶¶ 9, 11). During his deposition on March 7, 2022, Hollohan confirmed that the Guardian SmartFlagger communicates with a Site 2020 "network operations center" to monitor multiple worksites. (Doc. 80-6 at 25-26 [261:23-264:18]). Until that time, Superior Traffic contends, it did not have a firm basis for asserting that the Guardian SmartFlagger was infringing on its '817 Patent. (Doc. 87 at 16).

Site 2020 counters that Hollohan's deposition did not reveal any information about the functionality or operation of the Guardian SmartFlagger that was not available in public materials on Site 2020's website or the documents provided by Site 2020 in December 2021. (Doc. 81 at 19). Site 2020 thus stands by its position that Superior Traffic was not diligent in attempting to identify the allegedly infringing product and should not be permitted to file its Third Amended Counterclaims.

Notwithstanding Site 2020's arguments to the contrary, the Court finds that Superior Traffic has demonstrated it diligently pursued discovery and did not unduly delay in seeking leave to amend. Site 2020 does not identify what information on its website would have alerted Superior Traffic that the Guardian

59

SmartFlagger has the specific features it asserts are infringing on the '817 Patent. Even assuming Superior Traffic could have identified the Guardian SiteFlagger's allegedly infringing features based on the documents Site 2020 produced in December 2021, it did not unduly delay in waiting until April 2022 to seek leave amend, particularly given that it diligently sought to depose Hollohan in the interim and it was Hollohan's deposition testimony that confirmed the Guardian SmartFlagger has the allegedly infringing features. The Court also notes that, pursuant to the scheduling order in place when Superior Traffic filed its motion to amend in April 2022, fact discovery was not set to close for two months, the expert discovery deadline was still five months away, and trial was scheduled for March 2023. (Doc. 40).

For these reasons, the Court finds that Superior Traffic has demonstrated good cause for permitting it to file its Third Amended Counterclaims, and next considers whether leave to amend is appropriate under Rule 15.

    2.   <u>Amendment Under Rule 15</u>

        a.   *Prejudice*

Superior Traffic argues Site 2020 will not be prejudiced if it is allowed to file its Third Amended Counterclaims because Site 2020 has been on notice since the disclosure of preliminary infringement contentions in October 2021 that the Guardian SmartFlagger is at issue in the litigation. As indicated above, Superior

Traffic broadly defined the accused systems in its October 7, 2021, preliminary infringement contentions as including the Guardian PTL "and/or the Guardian SmartFlagger." (Doc. 80-4, at 5-6). See *ParkerVision, Inc. v. Qualcomm Inc.* 2015 WL 4751354, at *3 (M.D. Fla. Aug. 11, 2015 ("The purpose of infringement contentions is to provide the [accused infringer] with notice of the [patentee's] theories of infringement beyond what is disclosed in the complaint."); *Beijin Choice Elec. Tech. Co. v. Contec Med. Sys. USA Inc.*, 2020 WL 1701861, at *12 (N.D. Ill. Apr. 8, 2020) (recognizing "that the accused products a patentee identifies in its complaint do not necessarily control a case because the patentee later identifies the accused products at issue as part of its Initial and Final Infringement Contentions.").

In addition, since disclosing its preliminary infringement contentions, Superior Traffic has sought and obtained discovery relating to Site 2020's Guardian SmartFlagger products. Specifically, Superior Traffic served several interrogatories and requests for production seeking information relating either to a "Site 2020 Patented Product," commercial embodiments of the Site 2020 Patents-in-Suit, or a "Site 2020 Accused Product." (See Doc. 87-1 Interrogatory No. 5; Doc. 87-2 Interrogatory Nos. 10, 15, and 17; Doc. 87-3 Request Nos. 9, 14, 16-18; Doc. 87-4 Request Nos. 24, 36, 37, 44-57, 62, 65, 67, 68, 71, 72, 77, 82, 84, 90, 95-97, 101, and 103). Superior Traffic's discovery requests define a "Site 2020

Patented Product" to include any product "that Site 2020 contends is an embodiment of any claims of the Site 2020 Patents-In-Suit and/or a Site 2020 Related Patent." (Doc. 87-2 at 6; Doc. 87-3, at 5; Doc. 87-4, at 6). Because Site 2020 contends that the Guardian SmartFlagger is an embodiment of the Site 2020 Patents-In-Suit (Doc. 87-1 at 18), it meets the definition of a Site 2020 Patented Product. The Guardian SmartFlagger can also be considered a "Site 2020 Accused Product," which Superior Traffic defines in its discovery requests to mean "any Site 2020 products that Superior identified in its Counterclaims, Amended Counterclaims, infringement contentions, and any additional products that are not colorably different from those products." (Doc. 87-2 at 6; Doc. 87-3, at 5; Doc. 87-4, at 6). As pointed out above, Site 2020 produced documents relating to the Guardian SmartFlagger on December 7, 2021. (Doc. 80-3 at ¶ 7). The record thus reflects that Site 2020 has long been on notice that the Guardian SmartFlagger is at least potentially at issue in the case. See *Mlc Intellectual Property, LLC v. Micron Technology, Inc.*, 2019 WL 978766, at *4 (N.D. Cal. Feb. 28, 2019) (finding no prejudice in permitting plaintiff to amend infringement contentions where discovery relating to the additional products had been taken)

Site 2020 nevertheless asserts it will be unduly prejudiced if Superior Traffic is permitted to amend its counterclaims to accuse a different product of infringement because it will not have sufficient time to conduct additional

62

discovery focusing on Superior Traffic's new claims. When Superior Traffic filed its motion to amend in April 2022, fact discovery was set to close two months later – in June 2022. (Doc. 40).  As explained above, however, the pretrial scheduling order was vacated in May 2022 and there is no pretrial schedule presently in place.

Site 2020 further argues that Superior Traffic's proposed amended infringement counterclaims will likely raise new claim construction disagreements, and points out that claim construction discovery closed more than three months before Superior Traffic sought leave to amend. Therefore, if Superior Traffic is permitted to amend its infringement counterclaims to accuse the Guardian SmartFlagger, Site 2020 asks that it be allowed to present the Court with any additional claim construction disputes that arise directly from the amendment. Specifically, Site 2020 requests (1) "the opportunity to submit a short supplemental claim construction brief regarding terms of the '817 Patent that now appear to be in dispute" and (2) "that fact discovery (and subsequent calendar dates) be extended by 90 days" to allow it adequate time to prepare its defenses prior to the end of discovery. Although Superior Traffic opposes both of these requests, the Court finds they are reasonable under circumstances, particularly in light of the fact that there is no pretrial schedule currently in place.

Finally, to the extent Site 2020 argues its Guardian SmartFlagger has fundamentally different features, functionality, and operation than the Guardian

PTL, it does not identify or explain what those differences are. Regardless, any potential prejudice to Site 2020 as a result of allowing Superior Traffic to amend its infringement counterclaims can be alleviated by permitting supplemental claim construction briefing if necessary and providing sufficient time for Site 2020 to conduct any necessary additional discovery.

        b.    *Undue Delay, Bad Faith, Futility, and Prior Amendments*

The remaining Rule 15 factors also weigh in favor of granting Superior Traffic leave to amend. As discussed above in finding good cause, Superior Traffic did not unduly delay in seeking to assert its Third Amended Counterclaims. Site 2020 does not argue that Superior Traffic has acted in bad faith in seeking leave to amend, and the Court finds no evidence of bad faith. Nor does Site 2020 argue that Superior Traffic's proposed Third Amended Counterclaims are futile. Taking the allegations in the Third Amended Counterclaims as true, Superior Traffic's proposed patent infringement counterclaims state a claim for relief. See *Sleekez, LLC v. Horton*, 2017 WL 1906957, at *4 D. Mont. April 21, 2017) (citing *Miller v. Rykoff-Sexton, Inc*., 845 F.2d 209, 214 (9th Cir. 1988) (futility is analyzed under the same standard that applies to a Rule 12(b)(6) motion to dismiss). Although Superior Traffic has previously amended its counterclaims, as discussed above it did not have all of the information necessary to accuse the Guardian SmartFlagger at the time of the prior amendments.

64

3.    Additional Factual Allegations

Superior Traffic also seeks leave to amend its counterclaims to include new

factual allegations regarding Site 2020's business operations and allegedly

deceptive trade practices. (Doc. 80-2 at 52 ¶ 105-112).

At the time Site 2020 filed its response in April 2022, it did not oppose

permitting Superior Traffic to amend its counterclaims to include these new factual

allegations. (Doc. 81, at 23). The factual allegations in paragraphs 105 through 111

of Superior Traffic's proposed pleading relate to Site 2020's alleged false and

misleading advertising, and do not implicate the conduct that forms the basis of

Superior Traffic's motion for sanctions. Superior Traffic should therefore be

allowed to include paragraphs 105 through 111 in its Third Amended

Counterclaims.

Superior Traffic also seeks to add details relating to Site 2020's ownership

and control of Southwest Safety "that deceived Superior into providing an hours-

long product demonstration while this case was pending." (Doc. 80 at 9). In

particular, Superior Traffic proposes adding the following paragraph:

> 112.    In December 2021, through Southwest Safety, Site 2020 induced
> Superior to make a commercial "pitch" about supplying AFAD products and
> services to Southwest Safety. During the demonstration, which last more
> than three hours, Southwest Safety asked for and received detailed
> information from Site 2020 regarding Site 2020's products, services, and
> future plans, and also inspected and photographed the AFAD units Superior
> had supplied. Neither Site 2020 nor Southwest Safety disclosed to Superior
> at any time that Site 2020 owned and controlled Southwest Safety, meaning

65

> that the pretext on which the demonstration was set was false and fraudulent, and that all information received by Site 2020 through that demonstration was obtained by subterfuge and denying Superior the protections of the discovery rules as well as the benefit of counsel.

(Doc. 80-2 at 53). Superior Traffic's motion for sanctions is based in large part on the conduct alleged in paragraph 112. Because the sanctions recommended above will provide a remedy for the prejudice suffered by Superior Traffic as a result of this conduct, Superior Traffic should not be permitted to also pursue tort remedies based on the same conduct. Accordingly, Superior Traffic's motion for leave file Third Amended Counterclaims should be denied as to paragraph 112, but granted in all other respects.

## IV.    **Conclusion**

For the reasons discussed above,

IT IS RECOMMENDED that Superior Traffic's Motion for Sanctions (Doc. 98) be GRANTED IN PART and DENIED IN PART. The Court should dismiss Site 2020's patent infringement claims against Superior Traffic, as set forth in Counts 1 and 2 of the First Amended Complaint (Doc. 29) with prejudice, but should decline to enter default against Site 2020 on any of Superior Traffic's Third Amended Counterclaims. Site 2020 should also be required to pay Superior Traffic's reasonable attorneys' fees and costs incurred in filing and litigating its motion for sanctions.

IT IS FURTHER RECOMMENDED that Superior Traffic's Motion for Leave to File Third Amended Counterclaims (Doc. 78) should be DENIED to the extent it seeks to include factual allegations relating to conduct by Site 2020 that is basis for Superior Traffic's motion for sanctions, but GRANTED in all other respects.

After presiding United States District Judge Christensen has reviewed this Findings and Recommendation and ruled on Superior Traffic's motions, the Court will set a scheduling conference to establish a pretrial schedule to govern any claims that remain in the case.

NOW, THEREFORE, IT IS ORDERED that the Clerk shall serve a copy of the Findings and Recommendation of the United States Magistrate Judge upon the parties. The parties are advised that pursuant to 28 U.S.C. § 636, any objections to the findings and recommendations must be filed with the Clerk of Court and copies served on opposing counsel within fourteen (14) days after entry hereof, or objection is waived.

DATED this 27th day of March, 2023.

Kathleen L. DeSoto
United States Magistrate Judge