IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| SITE 2020 INCORPORATED, | CV 21–63–M–DLC |
| Plaintiff, | |
| vs. | ORDER |
| SUPERIOR TRAFFIC SERVICES, LLC, | |
| Defendant. | |
| SUPERIOR TRAFFIC SERVICES, LLC and SUPERIOR TRAFFIC SYSTEMS, LLC, | |
| Counterclaim-Plaintiffs, | |
| vs. | |
| SITE 2020 INCORPORATED, | |
| Counterclaim-Defendant. | |

Before the Court is United States Magistrate Judge Kathleen L. DeSoto's

Findings and Recommendation ("F&R").  (Doc. 132.)  Judge DeSoto

recommended that Defendant and Counterclaim Plaintiff Superior Traffic Services,

LLC's and Counterclaim-Plaintiff Superior Traffic Systems, LLC's (collectively,

"Superior Traffic") Motion for Sanctions (Doc. 98) and Motion for Leave to File

Third Amended Counterclaims (Doc. 78) each be granted in part and denied in

1

part.  (*Id.* at 66–67.)  Specifically, Judge DeSoto recommended granting the

motion for sanctions insofar as it requested dismissal with prejudice of Plaintiff

and Counter-Defendant Site 2020 Incorporated's ("Site 2020") patent infringement

claims against Superior Traffic, as set forth in Counts 1 and 2 of the First Amended

Complaint (Doc. 29) and ordering payment of Superior Traffic's reasonable

attorneys' fees and costs incurred in filing and litigating the motion for sanctions.

(Doc. 132 at 66.)  Judge DeSoto recommended denying, however, Superior

Traffic's request that default judgment be entered against Site 2020 on any of

Superior Traffic's counterclaims, as set forth in Superior Traffic's Third Amended

Counterclaims (Doc. 80-1).  (Doc. 132 at 66.)  Judge DeSoto further recommended

that Superior Traffic be granted leave to file all of its Third Amended

Counterclaims except to the extent it sought to include factual allegations relating

to conduct by Site 2020 that is the basis for the motion for sanctions.  (*Id.* at 67.)

For the reasons stated herein, the Court will adopt Judge DeSoto's F&R in full.

## BACKGROUND

Judge DeSoto's F&R provides a thorough description of the procedural

history and factual background of this case.  *Site 2020, Inc. v. Superior Traffic

Servs., LLC*, No. CV 21-63-M-DLC-KLD, 2023 WL 4060099, at *1–5 (D. Mont.

Mar. 27, 2023).  The crux of the issue before the Court is whether case-terminating

sanctions are appropriate in response to Site 2020's conduct.  The factual summary

contained herein relies upon unobjected-to findings unless otherwise noted.

To summarize, Site 2020 and Superior Traffic are competitors in the

business of providing portable traffic signals, including Automated Flagger

Assistance Devices ("AFADs"), to road construction and maintenance companies.

*Id.* at *2.  In May 2021, the same month Site 2020 filed the instant patent

infringement lawsuit, persons or entities controlling Site 2020 acquired a

controlling stake in a company called Southwest Safety, which operates in the road

construction and maintenance business.  *Id.*  A few months later, Site 2020 posted

a testimonial video by Southwest Safety for Site 2020's Guardian SmartFlagger

AFAD; the video did not disclose Southwest Safety's affiliation with Site 2020.

*Id.*  Superior Traffic learned of the video and contacted Southwest Safety's

president of safety to see if the company would be willing to entertain another

business pitch from Superior Traffic—the previous pitch, which took place in

February 2021, had not led to a business relationship.[1]  *Id.*  Site 2020's former

---

[1] Site 2020 objects to the F&R's finding that "When Superior Traffic initiated this contact, it was not aware that Site 2020 and Southwest Safety were affiliated[,]" arguing that Superior Traffic was aware that Southwest Safety "was, at a minimum, a close, long-term customer of Site 2020[.]"  (Doc. 133 at 23.)  Site 2020's objection reflects a hyper-literal reading of a single sentence in isolation; the F&R accurately described Site 2020's acquisition of a controlling stake in Southwest Safety, and in the same paragraph as the objected-to sentence, the F&R describes the testimonial video by Southwest Safety promoting one of Site 2020's products, which also "did not reveal Southwest Safety's affiliation with Site 2020."  (Doc. 132 at 5.)  Obviously, the video revealed a customer relationship between Site 2020 and Southwest Safety.  The affiliation

chief operations officer Trevor Romkey, who by now had assumed control of operations at Southwest Safety, told Site 2020's leadership (including its CEO, Mitchell Hollohan) about Superior Traffic's request. *Id.* Romkey instructed Southwest Safety's sales manager (George Thompson) to accept Superior Traffic's product demonstration offer. *Id.* Thompson told Superior Traffic's sales representative (Mike Biggers) that Southwest Safety no longer had a contract with Site 2020. *Id.* at *3.[2]

Meanwhile, Romkey coordinated with Hollohan and Quinn Graham, Site 2020's field operations manager, to have Graham attend the meeting posing as a Southwest Safety employee. *Id.* These efforts included (1) providing Graham the fake name of Michael (Mike) Evans and an accompanying Southwest Safety email address and email signature including Graham's cell phone number, and (2) Romkey, Hollohan, and Chris Edelman (Site 2020's VP of sales and operations) providing Graham with questions to ask Superior Traffic during the meeting. *Id.* Graham installed a GoPro audiovisual recording device in the Southwest Safety warehouse where the product demonstration would take place.

---

the F&R was describing plainly was Site 2020's ownership of a controlling stake in Southwest Safety. The objection is overruled.

[2] Site 2020 objects to this finding, arguing that "[t]he only cited support for this assertion is Mr. Biggers' testimony[,]" Thompson was not asked about it at his deposition, and no produced communications support this finding. (Doc. 133 at 24.) Testimony need not be corroborated to be truthful. The objection is overruled.

*Id.* at \*4.  During the meeting on December 8, 2021, Graham asked Superior Traffic's president and CEO (Jeff Hollenback) and Biggers the questions suggested by Site 2020, and Superior Traffic's representatives "provided extensive narrative answers on topics including: (1) automatic and manual mode operation . . . ; (2) unit communication functionality . . . ; (3) video feed communication functionality . . . ; (4) unit control . . . ; (5) network operations center control and functionality . . . ; (6) how the units are towed in tandem . . . ; (7) who manufactures the units . . . ; (8) solar power to the units . . . ; and (9) TESS mobile app functionality. . . ."  *Id.*

As the meeting shifted to discussing a prospective business relationship, Graham asked, and Superior Traffic's representatives answered, about: "(1) how Superior Traffic makes its software available . . . ; (2) a new business relationship model for Superior Traffic's partners . . . ; and (3) Superior Traffic's efforts with regard to regulation . . . .  Superior Traffic had only disclosed this information to two other potential business partners and would not have divulged it during the meeting had it not viewed Southwest Safety as a trustworthy potential business partner."[3]  *Id.*  "Graham also elicited information regarding the cost of Superior Traffic's units, where they are made, and how Superior Traffic's contracts

---

[3] Site 2020 objects to this finding.  The objection is overruled for the reasons discussed later in this order.  *See infra* n.8.

work. . . .  As the meeting was ending, Superior Traffic agreed to leave the two AFAD units it brought to the demonstration with Southwest Safety so that it could test the units at a jobsite in New Mexico." *Id.*

At no point during the meeting did Site 2020 or Southwest Safety inform Superior Traffic about Site 2020's acquisition of a controlling stake in Southwest Safety, "Mike Evans'" true identity, or the fact that the product demonstration was recorded. *Id.* at *5.  Graham provided Hollohan, Romkey, and Edelman with the GoPro's recording of the demonstration and photographs he took of Superior Traffic's AFAD units. *Id.*

On January 6, 2022, Hollenback and Superior Traffic's VP of sales and operations, Mike Davis, received a call from Isaac Cutrer, who identified himself as a former Southwest Safety employee. *Id.*  Cutrer told Hollenback and Davis that "Mike Evans" was actually Quinn Graham, and identified his source of information as Robert Sanchez, who described Graham's actions as "covert spy shit." *Id.*  Superior Traffic asked Cutrer if he would be willing to take photographs of the AFAD units, and he agreed and did so.[4] *Id.*  The photographs indicated that

---

[4] Site 2020 objects to Judge DeSoto's finding that "Superior Traffic assumed Cutrer would be able to take the requested photographs from off Southwest Safety's property.  Superior Traffic did not ask Cutrer to enter Southwest Safety's premises to obtain the photographs." (Doc. 133 at 25.)  Site 2020 argues that the finding is contradicted by the request to obtain photographs itself because the AFADs were in Southwest Safety's warehouse and by Hollenback's request that the photographs be taken only if Cutrer could do so without being seen. (*Id.*)  Setting aside that the objection cites to entirely irrelevant portions of Hollenback's deposition, the relevant testimony reveals that Hollenback mistakenly believed that the AFADs were outside of a fence on a border

6

someone had disassembled the AFAD units' control devices after the product demonstration. *Id.* Superior Traffic arranged for a contract hauler to retrieve its AFAD units the next day. *Id.* Romkey and Edelman instructed Graham, still posing as Mike Evans, to contact Superior Traffic and ask them to return the units, and he did so several times in January 2022. *Id.* Romkey instructed Graham to tell Superior Traffic that if it would return the AFAD units, Southwest Safety would commit to entering into a contract with Superior Traffic. *Id.* Graham, as "Mike Evans," maintained the façade by telling Superior Traffic that Southwest Safety was having "some customer support issues" with Site 2020. *Id.*

Site 2020's conduct came to the Court's attention at a status conference held before Judge DeSoto on May 17, 2022. The pretrial scheduling order was vacated, and Judge DeSoto held a hearing on Superior Traffic's motion for sanctions on December 13, 2022.

## LEGAL STANDARDS

Site 2020 has objected to the F&R insofar as it recommended imposing case-terminating sanctions on Site 2020. (Doc. 133.)[5] Upon the filing of an

---

of Southwest Safety's property and not inside a warehouse, where they were ultimately photographed. (Doc. 108-1 at 144:23–166:17.) The objection is overruled.

[5] Site 2020 did not object to Judge DeSoto's recommendation that Superior Traffic's motion for leave to file third amended counterclaims be granted in part and denied in part; reviewing for clear error, the Court finds none and will adopt that recommendation in full. Similarly, neither party objected to Judge DeSoto's Findings and Recommendation that Site 2020's motion to dismiss (Doc. 48) be denied. Although the motion will effectively be mooted by the filing of the

objection, the district court must undertake a de novo review of those portions of the magistrate judge's findings and recommendations to which a party specifically objects. 28 U.S.C. § 636(b)(1). Such review is necessary only if a party objects within fourteen (14) days after being served with the findings and recommendations. *Id.*; *see Shiny Rock Mining Corp. v. United States*, 825 F.2d 216, 218 (9th Cir. 1987). A proper objection must "itemize" each factual finding and recommendation to which objection is made, "identifying the evidence in the record the party relies on to contradict that finding . . . [and] setting forth the authority the party relies on to contradict that recommendation." D. Mont. L.R. 72.3(a). The Court reviews for clear error those findings and recommendations to which no party timely objects. *See Thomas v. Arn*, 474 U.S. 140, 149 (1985); *McDonnell Douglas Corp. v. Commodore Bus. Machs., Inc.*, 656 F.2d 1309, 1313 (9th Cir. 1981). Clear error exists if the Court is left with a "definite and firm conviction that a mistake has been committed." *United States v. Syrax*, 235 F.3d 422, 427 (9th Cir. 2000) (internal quotation omitted). Unless otherwise noted, the discussion contained in this Order is based on the Court's de novo review of the F&R and the entire record in this case.

> "Federal courts possess certain inherent powers, not conferred by rule or statute, to manage their own affairs so as to achieve the orderly and expeditious disposition of cases. . . . That authority includes the ability

---

Third Amended Counterclaims, in the interest of cleaning up the record, the Court reviews that F&R (Doc. 72) for clear error, finds none, and will adopt it in full.

> to fashion an appropriate sanction for conduct which abuses the judicial process." . . . This power includes the ability to punish conduct before the court as well as actions beyond the court's confines, regardless of whether that conduct interfered with courtroom proceedings.

*Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1088 (9th Cir. 2021) (citations omitted) (quoting *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017)). "Because of their very potency," the Court's "inherent powers must be exercised with restraint and discretion." *Id.* (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991)). "When acting under its inherent authority to impose a sanction, as opposed to applying a rule or statute, a district court must find either: (1) a willful violation of a court order; or (2) bad faith." *Id.* at 1090. Bad faith "requires proof of bad intent or improper purpose" and may include bad faith found in the conduct of the litigation, but the court must make an explicit finding that the sanctioned party's conduct constituted or was tantamount to bad faith. *Id.*

"Dismissal is an available sanction when 'a party has engaged deliberately in deceptive practices that undermine the integrity of the judicial proceedings' because 'courts have inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice.'" *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006) (quoting *Anheuser-Busch, Inc. v. Nat. Beverage Distribs.*, 69 F.3d 337, 349 (9th Cir. 1995)). "Before imposing the 'harsh sanction' of dismissal, however, the district court should consider the following factors: '(1) the public's interest in

expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions.'"  *Id.* (quoting *Anheuser-Busch*, 69 F.3d at 348).

**ANALYSIS**

Site 2020 contends that case-terminating sanctions are inappropriate for several reasons, each of which the Court will address in turn.

## I.   Case-terminating sanctions do not violate Site 2020's due process rights on the facts of this case.

"Due process limits the imposition of the severe sanctions of dismissal or default to 'extreme circumstances' in which 'the deception relates to the matters in controversy' and prevents their imposition 'merely for punishment of an infraction that did not threaten to interfere with the rightful decision of the case.'"  *Fjelstad v. Am. Honda Motor Co.*, 762 F.2d 1334, 1338 (9th Cir. 1985) (quoting *Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 589, 591 (9th Cir. 1983)).  Site 2020 argues that this threshold requirement is not met on the facts of this case.  The Court disagrees.

Site 2020 asserts that the F&R "fails to directly address whether (or how) the information learned by Site 2020 during the demonstration actually 'interferes with the rightful decision in the case.'"  (Doc. 133 at 9 (quoting *Fjelstad*, 762 F.2d at

1338).)  Site 2020 repeatedly insists that there is no allegation that Site 2020 utilized or attempted to utilize any information disclosed during the demonstration in connection with this litigation, and it promises it will not use such information in the litigation.  (*Id.* at 8–10.)  Rather, Site 2020 argues that the uncontradicted evidence shows that Graham attended the demonstration "solely to competitively analyze Superior's AFAD product[.]"  (*Id.* at 8–9.)  Site 2020 further argues that, prior to the demonstration, "Superior Traffic had already produced—to Site 2020's counsel pursuant to the confidentiality provisions of the parties' Stipulated Protective Order (Doc. 53)—the detailed technical documentation necessary to prove Site 2020's patent infringement claims."  (*Id.* at 9 n.6.)  Accordingly, Site 2020 argues, there is no indication that the product demonstration will interfere with the rightful decision of Site 2020's patent infringement claims.  (*Id.* at 9–10 n.6.)

The Court disagrees.  As a threshold matter, the test set forth in *Fjelstad* prohibits imposition of case-terminating sanctions for "an infraction that did not *threaten* to interfere with the rightful decision of the case."  *Fjelstad*, 762 F.2d at 1338 (emphasis added).  An obvious example of misconduct that threatens to interfere with the rightful decision of a case is a party's willful failure to produce evidence directly relevant to another party's claims or defenses.  *See, e.g.*, *Wyle*, 709 F.2d at 591; *Leon*, 464 F.3d at 959–60.  By contrast, the mere "infraction"

11

often cited by Ninth Circuit cases was a party seeking to delay trial submitting a forged doctor's note to the court that he was too ill to attend trial; because the lie was "wholly unrelated to the matters in controversy, no legitimate inference regarding the merits of [that party's] position may be drawn," and imposition of default as a sanction violated the party's due process rights. *Phoceene Sous-Marine, S.A. v. U.S. Phosmarine, Inc.*, 682 F.2d 802, 806 (9th Cir. 1982).

The situation presented by this case is somewhat unique because it involves a party obtaining information it was not supposed to have rather than withholding information it was supposed to disclose. However, the circumstances of Site 2020's conduct make clear that it was not a mere "infraction." Less than one month after the parties entered into a stipulated protective order "to facilitate document production and disclosure, and protect the respective interests of the parties in their trade secrets and/or confidential information," Site 2020's leadership successfully conspired to gain direct access to Superior Traffic's allegedly infringing product—which apparently was later disassembled in Southwest Safety's custody. Site 2020 also succeeded in planning, conducting, and recording a lengthy ex parte interview of Superior Traffic's president and chief operating officer, who perceived Site 2020's agent to be a potential customer, not a competitor or litigation opponent. By coordinating this "covert spy shit," Site 2020's leadership obtained access to the kinds of information it had previously

stipulated would properly be designated "ATTORNEYS' EYES ONLY" in discovery because it would "create a substantial risk of serious harm" if disclosed to another party: "trade secrets; technical information; technical practices; . . . pricing data; . . . strategic business plans; [and] selling or marketing strategies . . . ." (Doc. 53 at 2, 8–9.)

To be sure, Site 2020's *counsel* may have had access to the technical details about Superior Traffic's AFAD product underlying Site 2020's infringement claims through the ordinary discovery process.  But Site 2020 does not—and on the record before the Court, could not—contend that either it or its counsel inevitably would have had access to a recording of Superior Traffic's president conducting a sales pitch for a product at issue in the pending lawsuit and answering every question Site 2020 wanted to know about Superior Traffic's product and business practices in a setting that was both unguarded and without the benefit of counsel.

Unlike the party who forged a doctor's note in *Phoceene*, these facts do not illustrate a single incident of poor judgment or a standalone misrepresentation to the Court.  Rather, they are akin to the "pattern of deception and discovery abuse" in *Anheuser-Busch*, which "made it impossible for the district court to conduct [a] trial with any reasonable assurance that the truth would be available."  69 F.3d at 352.  Site 2020 has demonstrated that it is willing to engage in extraordinary,

elaborate deception to gain access to information about its opponent in this

litigation that it could not obtain via the discovery process.  The Court cannot be

assured that, now that Site 2020 has been caught, all deceptions have come to light

and it will play fairly going forward.  Indeed, as Judge DeSoto found, "[t]he

deceptive conduct of Site 2020's leadership still has not abated," with both

Romkey and Hollohan denying knowledge of Graham's conduct and otherwise

answering evasively when questioned about the scheme[6], and Thompson blatantly

lying that he was not present at the product demonstration.  (Doc. 132 at 30–34.)

---

[6] Site 2020 objects to Judge DeSoto's finding that "When Superior Traffic deposed Romkey and
Hollohan in March 2022, they denied knowing whether Graham identified himself to Superior
Traffic as a representative of Site 2020 during the product demonstration."  (Doc. 133 at 25–26.)
Site 2020 argues that the finding is contradicted by the record because Romkey and Hollohan
"testified truthfully during their respective depositions and accurately answered each of the
questions posed" because neither of them "had personal knowledge of *precisely how Mr.
Graham identified himself during that meeting*" because they did not attend the demonstration
themselves.  (Doc. 133 at 26 (emphasis in original).)  In essence, Site 2020 does not object to
Judge DeSoto's finding that Romkey and Hollohan denied knowledge, but rather objects to her
conclusion that they were not credible, which was based in part on the testimony at issue.  The
record amply supports Judge DeSoto's conclusion that Romkey and Hollohan were not credible
witnesses because documents show they were intimately involved with coordinating Graham's
presence at the demonstration and received a debriefing from Graham afterward regarding
valuable competitive intel, which undoubtedly would not have been disclosed if Graham
revealed his true identity.  The objection is overruled.

Likewise, Site 2020 objects to Judge DeSoto's finding that Romkey obscured the known
affiliation between Site 2020 and Southwest Safety because he "accurately and fully detailed the
affiliation in response to opposing counsel's questioning, including expressly confirming that
Site 2020 USA owns Southwest Services LLC[.]"  (Doc. 133 at 33.)  This argument ignores that
Romkey at first answered that Southwest Safety is a "customer" of Site 2020 (Doc. 108-5 at
132:15–17), and only much later, upon more probing questioning, acknowledged that "Site 2020
Canada owns Site 2020 USA," which owns "several subsidiary companies" including Southwest
Services (*id.* at 214:10–19).  Judge DeSoto appropriately concluded that Romkey was obscuring
the actual relationship.  The objection is overruled.

14

Accordingly, the Court assigns minimal weight to Site 2020's contention that the purpose of its chicanery was to gain a business advantage rather than a litigation advantage. Even if true, the scheme evolved and occurred while this litigation was ongoing, at the behest of Site 2020 leaders who were aware of the litigation, and shortly after Site 2020 agreed in a stipulated protective order that it should not have access to precisely the information it sought at the meeting. The information obtained is directly relevant to Site 2020's claims, and, as Judge DeSoto concluded, in light of Site 2020's demonstrated willingness to lie its way to a perceived advantage, neither the Court nor Superior Traffic can rely on Site 2020's assurances that none of the information it deceptively obtained will be relied upon or utilized in this litigation. The "close nexus between [Site 2020's] misconduct and the merits of [its] case" mean that "due process concerns are not implicated." *Anheuser-Busch*, 69 F.3d at 355.[7]  But even if they were, Site 2020's misconduct clearly threatens to interfere with the rightful decision of the case. *Fjelstad*, 762

---

[7] Site 2020 objects to Judge DeSoto's finding that "Site 2020 also obtained information on matters relevant to some of Superior Traffic's counterclaims, including particularly those based on Site 2020's alleged false and misleading advertising." (Doc. 133 at 25.)  Site 2020 argues that this finding is irrelevant to the Court's decision to dismiss Site 2020's affirmative patent infringement claims, especially in light of the Court's decision to reject Superior Traffic's request to grant judgment in its favor on its counterclaims. (*Id.*)  But Site 2020 does not identify any reason to conclude that this finding is erroneous. The F&R includes this finding in explaining the vast array of information Site 2020 gained as a result of Graham's surreptitious attendance at the December demonstration and how that information was relevant to the merits of the litigation. (Doc. 132 at 19–20.)  This finding plainly is relevant to the Court's analysis of whether case-dispositive sanctions are warranted and whether due process concerns are implicated.

F.2d at 1338.  For the same reasons, this case falls comfortably within the range of cases where "dismissal is warranted" because "a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings[.]" *Anheuser-Busch*, 69 F.3d at 148.

## II.     The multi-factor case-terminating sanctions analysis supports imposition of case-terminating sanctions on these facts.

Site 2020 objects that, in applying the five-factor test set forth in *Leon*, the F&R "does not accurately evaluate the public policy favoring merits disposition, the alleged prejudice to Superior, or the availability of lesser sanctions."  (Doc. 133 at 11.)  The Court has reviewed the F&R's application of the unobjected-to factors—the public's interest in expeditious resolution of litigation and the court's need to manage its own docket—for clear error and, finding none, adopts those aspects of the F&R in full.

### A.     Public policy favoring disposition of cases on their merits

Site 2020 argues that the F&R acknowledges that the public policy favoring resolving cases on their merits weighs against terminating sanctions but includes "no analysis of this factor or its relative weight."  (Doc. 133 at 11.)  Site 2020 contends that this case is distinct from the primary case on which the F&R relies, *Xyngular Corp. v. Schenkel*, 200 F. Supp. 3d 1273 (D. Utah 2016), because Site 2020's actions were not intended to improperly influence the judicial process, and

16

Site 2020 will not seek to use any information learned in the product demonstration in connection with this litigation.  (Doc. 133 at 11–12.)

As the due process discussion above indicates, the Court is not persuaded by these arguments.  The Court agrees with Superior Traffic and the F&R that the analysis in *Xyngular Corp.* is on point.  To be sure, the sanctioned party in that case actually used the documents he improperly obtained outside of the discovery process in support of his claims, defenses, and an application for a temporary restraining order.  *Xyngular Corp.*, 200 F. Supp. 3d at 1317.  But that was not the sole or even primary basis for the court's conclusion that serious sanctions were warranted; rather, the court acknowledged that "some or all of the documents might otherwise have been produced during discovery," but emphasized that "'those decisions are best resolved through the formal discovery process,' a process that [the sanctioned party] usurped for his own purposes."  *Id.* (quoting *Glynn v. Edo Corp.*, No. CV JFM-07-01660, 2010 WL 3294347, at *5 (D. Md. Aug. 20, 2010)).  The court plainly focused on the sanctioned party's conduct in "improperly gathering" the documents, not their use:

> Parties anticipating litigation may not engage in self-help by improperly gathering a potential adversary's property.  This conduct is an affront to the established rules of engagement and fair play in lawsuits.  It amounts to an end-run around the Federal Rules of Civil Procedure, including the rules governing discovery and the orderly exchange of information relevant to disputes presented for resolution in our courts.  This conduct undermines the confidence of both litigants and the public in the fairness of judicial proceedings.  Schenkel's

17

> actions demonstrate willfulness, bad faith, and fault that abuses the
> judicial process and impugns the integrity of these proceedings.

*Id.* The Court agrees entirely with this reasoning, and Judge DeSoto rightfully

rejected Site 2020's representations that its counsel already had all necessary

product details for the litigation and would not use the information gained at the

product demonstration in this litigation as beside the point.  It is the fact that Site

2020 planned and executed an elaborate artifice to obtain information to which it

was not entitled—including information it *stipulated* was so highly sensitive that

its disclosure to the parties in the litigation would risk serious harm (*see* Doc.

53)—that undermines the Court's confidence in the fairness of these proceedings.

Under these circumstances, and consistent with Ninth Circuit case law,

Judge DeSoto properly accounted for the public policy favoring merits disposition

in weighing the requisite factors; she was not required to engage in an in-depth

discussion of each.  *Wanderer v. Johnson*, 910 F.2d 652, 656 (9th Cir. 1990) ("The

first two of these factors favor the imposition of sanctions in most cases, while the

fourth cuts against a default or dismissal sanction.  Thus the key factors are

prejudice and availability of lesser sanctions.").  Moreover, Judge DeSoto properly

accounted for this factor (and others) in denying Superior Traffic's request to enter

default judgment in its favor on all of its counterclaims, allowing Superior Traffic

the option to proceed on its counterclaims on the merits if it chooses to do so while

removing it from the "untenable position of having to defend itself against patent

18

infringement claims asserted by a party opponent who has not litigated those claims in good faith." (Doc. 132 at 50–51.)

## B.    Risk of prejudice to Superior Traffic

Site 2020 argues that its conduct "has not impaired Superior's ability to go to trial and . . . does not threaten in any way to interfere with the rightful decision of the parties' claims in this case." (Doc. 133 at 12–13.) As discussed above, the Court rejects this argument. Site 2020 also objects to specific findings contained within Judge DeSoto's analysis, including that:

> (1) 'Superior Traffic was denied the benefit of legal counsel during a lengthy meeting with its litigation opponent on subject matters related to the merits of the ongoing case between them' (F&R at 41); (2) 'Site 2020 surreptitiously obtained an advance look at the demeanor and presentation of Hollenback, one of Superior Traffic's key witnesses, to Superior Traffic's detriment' (*id.*); [and] (3) '[g]iven Site 2020's conduct, Hollenback has reasonably lost confidence that any confidential information conveyed to Site 2020 during the course of this litigation will remain confidential' (*id.* at 42).

(Doc. 133 at 13.)

As to the first two findings, Site 2020 argues "it is difficult to ascribe any actual prejudice to these assertions in view of their relevant context" because neither Superior nor Judge DeSoto identified "any specific information disclosed during the demonstration or gleaned from a preview of Mr. Hollenback's demeanor" that would impair Superior Traffic's ability to go to trial or the rightful decision of the case. (*Id.* at 14.) Site 2020 takes issue with Judge DeSoto's

19

rejection of its argument that its promise not to use any of that information in this litigation should spare them from case-terminating sanctions because "[u]nlike the case cited by the Magistrate Judge—*American Rena*—Site 2020 has made no attempt to use any of the information disclosed during the demonstration in connection with this lawsuit because there is absolutely no need or reason to do so." (Doc. 133 at 14–15 (citing *Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*, No. CV 1206972 FMO (JEMx), 2015 WL 12735433 (C.D. Cal. Dec. 14, 2015)).)

Site 2020 continues to miss the forest for the trees. Its leadership essentially arranged an ex parte deposition of Superior Traffic's president about one of the products at issue in this litigation under false pretenses. The fact that their scheme did not prove independently useful to the litigation, or at least not so useful that Site 2020's counsel is unwilling to promise to un-ring the bell, does not render their conduct harmless. Rather, it is Site 2020's "continued disrespect for the legal process" that has resulted in ongoing prejudice to Superior Traffic in the form of expending time and resources investigating this misconduct and bringing it to the attention of the Court, and Superior Traffic will be further prejudiced "by the significant costs that would be required to litigate against parties who exhibit little, if any, regard for the integrity of the judicial process." *Am. Rena Int'l Corp.*, 2015 WL 12732433, at *29–30. It would be intolerably ironic for this Court to force Superior Traffic to continue to defend itself against claims asserted by a party that

has demonstrated its extraordinary willingness to deceive to gain an advantage merely because Superior Traffic separately supplied Site 2020 with the information necessary to pursue its claims by dutifully complying with its discovery obligations.  Site 2020 cannot seek amnesty for its rule-breaking in the results of Superior Traffic's rule-following.

As to the third objected-to finding—Hollenback's loss of confidence that disclosed information will remain confidential—Site 2020 argues it is "unsupported by fact, ignores the protections offered by the protective order, is contradicted by Mr. Hollenback's own testimony, and should not be adopted." (Doc. 133 at 15–16.)  The evidence Site 2020 cites to rebut this finding includes documents left by Hollenback at the product demonstration and Hollenback's deposition testimony that: (1) he did not made Southwest Safety sign a confidentiality agreement before the product demonstration; (2) he left several brochures, a rental services agreement, and an application to leave units out overnight with Southwest Safety that were not identified as confidential; (3) he did not tell Southwest Safety that there was anything confidential about a new product he showed them; and (4) he did not tell Southwest Safety that he would be displaying or discussing anything that was confidential.  (Doc. 133 at 16 n.9.)  All that this evidence shows is that Hollenback did not expressly communicate to Southwest Safety that the product demonstration included confidential information.

Hollenback clearly testified—immediately after some of the testimony cited by Site 2020—that he would not have given the same product demonstration "regardless of who was there" at the demonstration: "Somebody that's suing us in litigation had a unit and was a competitor, I would not give them that same demo, no." (Doc. 108-1 at 77:8–15.)  He further testified that he "[n]ever" would have made the presentation to a direct competitor, particularly one who has sued him for patent infringement, he would not have made the disclosures he made about the product and its system, and he disclosed information to Graham that was not discussed in any patent filings during the demonstration but would not have done so if he had known he was disclosing information to Site 2020.  (*Id.* at 229:10–14, 230:7–25, 233:3–234:17, 239:15–240:21.)[8]

Hollenback did testify that he had not lost faith in the judicial process "[a]s a result of the Southwest Safety issue," but rather expressed frustration that Superior Traffic was having to litigate the patent claims in the instant case despite obtaining their own patents in 2015.  (Doc. 108-1 at 198:23–199:25.)  He also testified that he was not concerned about Site 2020's *counsel* violating the protective order in this case by disclosing highly confidential information.  (Doc. 108-1 at 242:22–

---

[8] The Court relies on this same evidence to overrule Site 2020's objection to Judge DeSoto's finding that "Superior Traffic had only disclosed this information to two other potential business partners and would not have divulged it during the meeting had it not viewed Southwest Safety as a trustworthy potential business partner."  (Doc. 133 at 24.)

243:6.)  But as the broader context of these snippets of testimony make clear,

Hollenback was clarifying that neither he nor his attorney were accusing Site

2020's counsel of misconduct, but Hollenback testified that he could not trust Site

2020 to maintain the confidential nature of future discovery productions because

"[t]hey've proven beyond a shadow of a doubt that that's not the way they work"

and their conduct "definitely impacted [his] view of the judicial system."  (*Id.* at

238:20–239:14, 242:12–21; *see also* Doc. 101-15 at 258:7–11 ("Q: Do you trust

Site 2020 to behave in an ethical or fair manner in the context of this litigation

going forward?  A: Never.  Never.  I trust their counsel.  I don't trust them.").)

Hollenback's testimony supports rather than contradicts Judge DeSoto's

conclusion that Superior Traffic—and, indeed, the Court—has no reason to trust

Site 2020's "promise to be honest going forward."  *Am. Rena Int'l Corp.*, 2015 WL

12732433, at *30.  To be sure, there is no indication on this record that Site 2020's

counsel was involved in the scheme or that they would violate the stipulated

protective order as to highly confidential discovery.  However, Site 2020's

leadership circumvented the discovery process in an egregious manner in this case,

and those same individuals may be granted access to information designated as

"CONFIDENTIAL."  (Doc. 53 at 17.)  Hollenback's concerns about Site 2020's

ability to play by the rules going forward—including the protective order's rules

that confidential information may be used only for prosecuting, defending, or

attempting to settle this lawsuit (*id.* at 16)—are entirely reasonable, and they are shared by the Court.  Judge DeSoto reasonably concluded that Superior Traffic would be prejudiced if forced to continue defending itself against Site 2020's patent infringement claims.

Site 2020 also rehashes its argument that Superior Traffic did not raise the issue of the December 2021 product demonstration for "more than 130 days" after first learning about it.  (Doc. 133 at 17–18.)  Site 2020 quibbles with Judge DeSoto's characterization of this argument as arguing that the motion for sanctions be denied as untimely (*id.* at 18), but it fails to explain how Judge DeSoto's findings and conclusions regarding Superior Traffic's diligence in investigating the issue and timeliness of its motion for sanctions are erroneous.  On de novo review, the Court agrees with Judge DeSoto that Superior Traffic filed its motion promptly after obtaining sufficient evidence concerning Site 2020's conduct.[9]  For all of the

---

[9] Site 2020 objects to Judge DeSoto's finding that Superior Traffic "did not have sufficient evidence that Mike Evans was actually Graham until early May 2022" because Isaac Cutrer told them his identity on January 6, 2022, and Superior Traffic "further confirmed" that fact in February 2022.  (Doc. 133 at 27.)  This "finding" is in the context of analyzing the timeliness of Superior Traffic's motion and Superior Traffic's assessment of when it believed it had sufficient evidence to raise this issue as one of litigation misconduct to the Court; the evidence cited by Site 2020 does not indicate that the judgment call Superior Traffic and Judge DeSoto made about the strength of the evidence Superior Traffic possessed was erroneous.  The objection is overruled.

Likewise, Site 2020 objects to Judge DeSoto's finding that "Superior Traffic did not know until Graham's deposition several days after the hearing that Site 2020's senior leadership were personally involved in the fraud" because neither Romkey nor Hollohan denied knowledge of Graham's attendance at the demonstration at their early-March depositions.  (Doc. 133 at 27.)  The "personal involvement" Judge DeSoto cited to in Hollenback's deposition testimony was not

foregoing reasons, the Court overrules Site 2020's objections concerning Judge DeSoto's findings and conclusions relating to prejudice to Superior Traffic.

### C.    Availability of less drastic sanctions

Site 2020 argues that the F&R "plainly fails" the Ninth Circuit's analysis for determining whether a district court has "properly considered the adequacy of less drastic sanctions": (1) whether the court explicitly discussed feasibility of less drastic sanctions and explained why alternative sanctions would be inappropriate; (2) whether the court implemented alternative sanctions before ordering dismissal; and (3) whether the court warned the party of the possibility of dismissal before ordering it.  (Doc. 133 at 18–19 (quoting *Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1412–13 (9th Cir. 1990)).)  Site 2020 argues that Judge DeSoto "summarily conclude[d]" that lesser sanctions would be insufficient to remedy the prejudice Superior Traffic suffered and would not adequately deter future litigants from similar conduct, and "entirely ignore[d] lesser sanctions specifically proposed by Site 2020."  (*Id.* at 19.)

Site 2020's characterization of Judge DeSoto's multi-page analysis—which also incorporates by reference the previous findings and conclusions regarding Site 2020's willful and bad-faith conduct, circumvention of the rules of discovery, and

---

mere knowledge of Graham's presence, but rather their involvement in preparing questions for Graham to ask at the demonstration.  (Doc. 101-15 at 257:24–258:6.)  The objection is overruled.

deprivation of Superior Traffic's right to counsel—is demonstrably false, dismaying, and, frankly, illustrative of the pattern of Site 2020's disrespect for the judicial process at the heart of this case. (Doc. 132 at 45–52.)

First, Site 2020 contends that the Court could issue an order preventing Site 2020 from introducing or relying on any information disclosed during, or otherwise learned in connection with, the December demonstration to support or deny a claim in this case. (Doc. 133 at 20.) The problem with this suggested sanction is that it amounts to no consequence at all, for two reasons. First, Site 2020 has already promised, ad nauseum, that it will not introduce or rely on this information. Second, Site 2020 has represented that all information disclosed at the demonstration was otherwise known to Site 2020 or its counsel through the discovery process. This second reason provides another sufficient reason to reject this proposed alternative outright; if true, it will be impossible for the Court or Superior Traffic to identify whether the source of a proffered fact is the December demonstration or other discovery, short of express reliance on or citation to exhibits, and there is no way for the Court or Superior Traffic to determine whether a particular fact was called to Site 2020's attention because of the December demonstration—thus giving it a strategic advantage by knowing what Superior Traffic considered important about its product—as opposed to through ordinary document review and analysis.

26

Second, Site 2020 proposes that the Court prohibit its fact witnesses, including Romkey, Hollohan, and Graham, from testifying at trial regarding any aspects of Superior Traffic's accused products.  (Doc. 133 at 21.)  Again, this amounts to no consequence at all—and Site 2020 admits so.  "***As with every patent infringement case, Site 2020's claims will be demonstrated through the technical documentation produced by Superior Traffic and the testimony of Site 2020's <u>expert</u> witness—not through the testimony of any Site 2020 lay witness regarding the accused Superior Traffic products or through hearsay information disclosed during the Southwest Safety demonstration.***"  (Doc. 133 at 9–10 n.6 (emphasis in original).)  For the same reason, Site 2020's suggestion that it be prevented from calling Mr. Hollenback—an *adverse* witness—or relying on his testimony to support its *case-in-chief* requires little discussion.  (*Id.* at 14 n.8, 22.)  These proposed "sanctions" verge on frivolity.

The final two alternative sanctions proposed by Site 2020 fail to remedy the prejudice already suffered by Superior Traffic and which it will continue to suffer if it is forced "to defend itself against patent infringement claims asserted by a party opponent who has not litigated those claims in good faith."  (Doc. 132 at 51.)  The record amply supports—indeed, *exclusively* supports—a finding that Site 2020 has "deliberately engaged in deceptive practices that undermine the integrity of [these] judicial proceedings" and has "engaged in conduct utterly inconsistent with

the orderly administration of justice." *Leon*, 464 F.3d at 958.  Allowing Superior

Traffic to propound additional discovery, take more depositions, or amend its

pleadings to assert additional counterclaims in connection with Site 2020's

misconduct (Doc. 133 at 22) might be a plausible alternative *if* Site 2020's conduct

did not entail breathtaking dishonesty, which occurred during the pendency of this

litigation and after Site 2020 agreed to a stipulated protective order intended to

protect the parties' trade secrets, and continued forward into Superior Traffic's

efforts to investigate Site 2020's misconduct.  Forcing Superior Traffic to continue

defending itself against a party that has demonstrated its capacity and, indeed,

eagerness to deceive its way to a perceived advantage would amount to a

punishment for Superior Traffic, not the sanctioned party, even if the Court gifted

Superior Traffic more discovery ammunition in the fight.  Moreover, Judge DeSoto

was precisely right that such a sanction would fail to deter future misconduct; the

message would be that the consequence of flagrant contempt for the judicial

process is the possibility of marginal additional claims to litigate, even if the

wrongful party has demonstrated that it cannot be trusted to litigate the existing

claims in good faith.

Site 2020's proposed alternative sanctions—which ring of a child who has

hidden a game console under his pillow begging for his punishment to be exile to

his room—are plainly insufficient to remedy the prejudice Superior Traffic has

suffered and will continue to suffer in this litigation if forced to continue defending itself against Site 2020's claims.  The Court agrees entirely with Judge DeSoto's conclusion that dismissal of Site 2020's claims is the least onerous effective sanction that can be imposed under the circumstances.

The Court further notes that the balance Judge DeSoto struck in recommending declining Superior Traffic's request to enter judgment in its favor on its counterclaims reflects careful consideration of all of the *Leon* factors.  (Doc. 132 at 51–52.)  Dismissal of Site 2020's claims remedies the prejudice suffered by Superior Traffic and places Superior Traffic in the position of the sole plaintiff, and from there, knowing what it knows now about Site 2020's conduct, it may decide for itself whether it will continue litigating some or all of its claims.

## CONCLUSION

IT IS ORDERED that Judge DeSoto's Findings and Recommendations (Doc. 72; Doc. 132) are ADOPTED IN FULL.

IT IS FURTHER ORDERED that Site 2020's Motion to Dismiss (Doc. 48) is DENIED.

IT IS FURTHER ORDERED that Superior Traffic's Motion for Leave to File Third Amended Counterclaims (Doc. 78) is DENIED IN PART to the extent it seeks to include factual allegations relating to conduct by Site 2020 that is the basis

29

for Superior Traffic's motion for sanctions, but GRANTED IN PART in all other respects.

IT IS FURTHER ORDERED that Superior Traffic's Motion for Sanctions (Doc. 98) is GRANTED IN PART and DENIED IN PART.  Site 2020's patent infringement claims against Superior Traffic, as set forth in Counts 1 and 2 of the First Amended Complaint, are DISMISSED WITH PREJUDICE.  Site 2020 is ORDERED to pay Superior Traffic's reasonable attorneys' fees and costs incurred in filing and litigating the motion for sanctions.  The Court denies the motion for sanctions insofar as it requests default judgment in Superior Traffic's favor on its counterclaims.

DATED this 29th day of June, 2023.

Dana L. Christensen, District Judge
United States District Court